# IN THE SUPREME COURT OF IOWA

No. 17–0085

Filed June 7, 2019

**STATE OF IOWA,**

Appellee,

vs.

**LEE SAMUEL CHRISTENSEN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Emmet County, David A. Lester, Judge.

Defendant appeals from a district court judgment of second-degree murder. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Leon F. Spies of Spies, Pavelich & Foley, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller, Kelli Huser (until withdrawal), Kevin Cmelik, and Coleman McAllister, Assistant Attorneys General, and Doug Hansen, County Attorney, for appellee.

**APPEL, Justice.**

In this case, Lee Christensen challenges his conviction of second-degree murder following a jury trial. After the trial, Christensen moved for a new trial based upon (1) the refusal of the trial court to disqualify a juror who allegedly made out-of-court statements regarding the defendant's guilt, (2) prosecutorial misconduct related to allegedly improper testimony from two witnesses for the State, and (3) misconduct and bias related to extraneous information reaching the jury about a possible riot if a certain verdict was not returned. The district court denied the motions for a new trial, entered judgment, and sentenced Christensen. Christensen appealed.

We transferred the case to the court of appeals. The court of appeals reversed, holding Christensen was entitled to a new trial as a result of juror misconduct and bias. For the reasons expressed below, we vacate the court of appeals decision and affirm the district court judgment.

**I. Factual and Procedural Background.**

**A. Introduction.** Thomas Bortvit was dating Christensen's former girlfriend. Bortvit and Christensen both lived in Estherville, Iowa. After Bortvit was reported missing from work, a community search was undertaken in an effort to find him. As part of its investigation, law enforcement wanted to speak with Christensen. After law enforcement contacted the Christensen family about a potential interview, Christensen's mother asked him if he knew Bortvit's whereabouts, became suspicious, and confronted her son. Christensen ultimately told his father that he had killed Bortvit. Christensen provided his father with information that led to the discovery of Bortvit's body in a remote location.

The State charged Christensen, an Estherville high school student, with murder and other lesser included offenses. He pled not guilty. The

matter proceeded to jury trial in Estherville. The jury found him guilty of second-degree murder.

Christensen filed a posttrial motion attacking the verdict. He claimed the district court erred in refusing to grant a midtrial motion to disqualify a juror for cause. He further asserted the verdict was tainted because of juror misconduct. He also claimed prosecutorial misconduct associated with two witnesses' testimony required a new trial. The district court overruled the motion for a new trial, entered judgment, and sentenced Christensen. Christensen appealed.

**B. Selection of the Jury.** Before the jury trial began, the parties engaged in voir dire of the jury venire. The district court began by asking the jurors three questions: (1) whether they had heard about the case from the media, (2) whether they had heard about the case from sources besides the media, and (3) whether they had formed an opinion about the case. Many jurors answered affirmatively to one or more of the questions.

Counsel for the parties then conducted individual voir dire outside the presence of the other venire members. The voir dire process revealed that the events surrounding Bortvit's death were the subject of extensive discussion in the Estherville community. Many prospective jurors knew members of the Christensen family, the Bortvit family, or both. In addition, many prospective jurors further explained their knowledge about the case from the media and from other sources, including various Facebook postings.

A number of jurors believed they could not fairly judge the case because they had already formed opinions about the matter. Most often, these jurors believed Christensen was guilty. When asked if they could be fair in the proceedings, a number said they could not. Of the sixty prospective jurors, the district court disqualified twenty-four for cause.

During voir dire, the lawyers and prospective jurors recognized the emotional character of the case. One prospective juror stated, "I know that sentiments run high." Another remarked, "[I]t is so traumatic that this has happened. And whether or not he is guilty, everybody involved has been hurt . . . ." A third potential juror stopped going out for coffee because "[it was] too disturbing to [the juror] to listen to other people . . . disparagingly talk about individuals." A fourth potential juror when asked whether they were well suited to be a juror explained, "I just think I'm going to need a tissue a lot."

During voir dire of the entire panel, Christensen's attorney asked the jury if anyone had "difficulty with the notion that Lee Christensen doesn't have to prove his innocence, doesn't have to testify, that you can't hold it against him." No one responded in the affirmative.

At the close of jury selection, the district court described how the trial would proceed. The district court stated that after the close of the State's case, Christensen could present evidence "if he chooses to." The district court advised the jury, "[Christensen is] not required to [present evidence]. As you've been told, he's presumed innocent and the burden rests with the state."

**C. Instructions of the District Court Related to Extraneous Communications.** After the petit jury had been selected, the district court admonished the jury to avoid extraneous communication with anyone regarding the trial. Specifically, the district court instructed the jury,

> [Y]ou are not to converse among yourselves or with anyone else on any subject connected with this case. . . . If anyone should attempt to discuss this case with you or in your presence, walk away and do not listen. However, if anyone should persist in talking to you or in your presence, report it immediately . . . .

Further, the district court told the jury,

[Y]ou are admonished not to listen to, view, or read any form of media while this case is in progress. . . . This includes . . . the full gamut of social media, the internet, cell phone communications, Instagram, Twitter. Just for the next few days, I need to have you disconnect from that if you're involved at all.

**D. Overview of Evidence Adduced at Christensen's Trial.** On June 6, 2015, Bortvit was working in the meat department at a Fareway store in Estherville. That afternoon Christensen was seen at the Fareway meat counter. His truck was also spotted in the Fareway parking lot. Although his family was not going to be home that evening, Christensen bought some ground beef, which he put in the freezer when he returned home. Bortvit left the Fareway store for his break at about 4:00 p.m.

Bortvit's girlfriend, Cayley Fehr, was out of town but exchanged text messages with Bortvit during the afternoon. Bortvit told Fehr in a text message that he was with Christensen and that Christensen had asked for a ride because his truck had broken down. Fehr had dated Christensen in the past and knew of the antipathy Bortvit had toward Christensen. Later in the day, Fehr received a text message from Bortvit's phone stating that he no longer wanted to date or see Fehr and that they should see other people. Fehr subsequently received a text message from Christensen stating he had killed Bortvit.

Christensen arrived home at approximately 5:00 or 5:30 p.m. wearing a soiled T-shirt and jeans. He and his sister went downtown for a sandwich. Upon returning home, Christensen watched TV but then abruptly went upstairs.

Late that evening, Bortvit's friends discovered his car parked and locked in a residential area of Estherville. Police and community members began to look for Bortvit.

The next day, Christensen and his mother were driving to Sioux Falls to catch a flight to Arizona so that Christensen could attend a cross-country sports camp. She learned on Facebook that Bortvit was missing. When she told Christensen of the news, he sat quietly. That same day, Christensen's father participated in the search for Bortvit.

After law enforcement learned that Bortvit had been seen talking to Christensen at Fareway, they went to Christensen's home and told his sister they wanted to talk to him. When Christensen and his mother arrived in Arizona, his mother received a text message indicating the police wanted to talk to her son. After a confrontation, Christensen told his mother that he and Bortvit had gotten into a fight, that he got scared, and that he hit Bortvit with a rock. Thereafter, Christensen called his father and told him that he knew where Bortvit's body was. Christensen's father told police that Christensen had killed Bortvit. Using directions from Christensen, police drove to a place outside of town where Bortvit's body was located in a pasture.

A search warrant executed at the Christensen home produced a .45 caliber pistol, ammunition, clothing, and Bortvit's wallet in Christensen's room. In addition, investigators found bloodstained boots in the lower level of the residence. A search of Christensen's grandfather's farm produced three .45 caliber cartridge cases and three slugs. The trunk of Bortvit's car contained clothing and other items covered with blood.

An autopsy revealed that Bortvit died from multiple gunshots and that his body exhibited bruising and abrasions. A projectile retrieved from Bortvit's body was traced to the .45 caliber pistol found in Christensen's room. Testing of the pistol revealed Bortvit's, but not Christensen's, DNA on the grip of the gun. Examiners did not test the gun for blood or other biological sources of DNA.

The jury received the case on June 30, 2016, and deliberated into the evening without reaching a verdict. The jury returned to deliberate on July 1. That morning, the jurors delivered a note to the district court indicating they were "stuck between two verdicts and need[ed] to know what [their] options [we]re." The district court replied that the jurors "should continue to deliberate if [they] believe it would be productive in reaching a unanimous verdict." Later on the afternoon of July 1, the jurors returned a verdict of second-degree murder.

**E.  Issue of Juror Disqualification.**  During the trial, a member of the news media received a note stating that "there is a jury member telling people the young man is guilty and . . . she is sticking to it." The note also identified juror K.B. by a phonetic spelling of the juror's name. The member of the news media provided the note to the district court, and law enforcement conducted an investigation. The investigation revealed an employee of a local café heard a patron state that a juror, while at a family gathering, "kept on talking about the trial and that Lee Christensen was guilty and was going to find him guilty no matter what."

Law enforcement prepared an investigative report and the café employee signed a written statement describing the events. These documents were admitted into evidence as court exhibits. No testimony was obtained from the employee who provided the written statement nor from the person in the café who was overheard stating the juror had made up her mind on the question of Christensen's guilt.

The district court summoned juror K.B. into chambers. The court conducted an examination of the juror without objections of either party. When asked whether she had spoken to anyone about the case, the juror stated, "I don't believe I did. I think I said I was a juror maybe, you know, or they knew I was a juror." When asked whether she had expressed an

opinion about Christensen's guilt, she said she did not because she did not know. When pressed whether she made any statements about Christensen's guilt, she stated, "I don't believe I did. I don't think I ever said anything about his guilt or innocence." When asked if she was certain, the juror responded, "I'm trying to think. I don't remember making any statements about the guilt or innocence because I do not know." Christensen moved to remove the juror. The district court denied the motion.

Christensen again raised the issue of juror disqualification in a motion for new trial. The district court denied the motion, declaring the ruling, among others, was "consistent with and supported by existing Iowa law, and, more importantly, neither prejudiced Christensen nor violated his rights to a fair trial and due process of law under the constitutions of the United States and the State of Iowa."

### F. Overview of Alleged Prosecutorial Misconduct.

1. *Presumption of innocence/burden of proof.* During the trial, the State called criminalist Tara Scott as a witness. During her examination, Scott testified that DNA from Bortvit was detected on the grip of the handgun asserted to be the weapon used to kill him. She also testified that the handgun was not screened for blood and that forensic testing was not conducted to determine if the source of the DNA was Bortvit's skin or perspiration (which might suggest Bortvit at one point held the gun). Further, on cross-examination, Scott testified that scrapings found underneath Bortvit's fingernails were not tested because Scott had been told that "no struggle was indicated."

On redirect, the prosecution asked Scott if the physical evidence was available for testing by others. Scott testified that it was. Christensen objected and asked to be heard outside the presence of the jury. Outside

the jury's presence, Christensen objected to the question and answer which "inferred that the defendant has not taken steps to prove his own innocence." Christensen argued the testimony violated the district court's ruling in a motion in limine and constituted "a direct comment on the defendant's presumption of innocence and the burden of proof in this case." In light of the statement, Christensen said that the court could not "unring the bell." He moved for a mistrial. The State responded that the questioning did not cross the line, that the answer was not clear, and in any event, that a curative instruction would be sufficient to cure any error.

The district court concluded that the questioning did not violate the motion in limine but did have the implication that the defendant has an obligation to prove his innocence. This, the court said, was improper. The court determined that rather than grant a mistrial, it would provide the jury with a curative instruction.

When the jury returned to the courtroom, the district court told the jury:

> There was . . . a question by [the prosecution] to the effect that [items of evidence] were available for someone else to test them; is that right? And the answer was yes. At that time there was the objection made. I will tell you now that line of questioning was improper because in my opinion that reversed the roles that have been clearly stated to you several times now by suggesting that the defendant somehow has an obligation to prove his innocence. We've told you many, many times, including in our preliminary instructions that that is not the case. So, at this point in time, I am directing you to disregard that line of questioning and disregard those answers because, again, those were improper. Understood? Everybody please acknowledge. I'll acknowledge that all members of the jury have confirmed their understanding.

2. *False testimony.* The State also called DCI investigator Peter Wagner as a witness. Wagner testified he used a metal detector to search for shell casings on the Christensen farm to determine where Bortvit's fatal

injuries were inflicted. Wagner offered inconsistent testimony on cross-examination as to whether a metal detector had, in fact, been used. Wagner acknowledged that he stated in a pretrial deposition that he was unsure whether a metal detector was used. On redirect, however, Wagner claimed that he had spoken with another crime scene investigator, Keri Davis, during a lunch recess and that she told him a metal detector had, in fact, been used.

After the redirect examination, Christensen's counsel contacted Davis, who confirmed she had talked with Wagner but told him that a metal detector was not used at the scene because the middle rod of the detector was missing. Christensen's counsel moved for a mistrial, asserting the State had introduced false testimony.

The district court had Davis testify by phone in chambers. She confirmed what defense counsel had told the court, namely, that the metal detector was not used, that she had not told Wagner the metal detector was used, and that she had not told Wagner her deposition testimony to that effect was incorrect.

The district court did not grant Christensen's motion for mistrial. Yet, the district court was plainly concerned. In chambers outside the presence of the jury, the district court stated that it did not find Wagner "intentionally falsif[ied]" his testimony but that it "borders on reckless because it strictly was an opinion that he reached based on his discussions with [Davis]." The district court advised Wagner that "[he] came very close to having recklessly offered false testimony here" and that he should be "very careful" when he phrased his answers to questions.

When the jury returned to the courtroom, the district court addressed the question of Wagner's testimony. The district court noted that Wagner had provided testimony concerning statements attributed to

Keri Davis, a fellow investigator at the scene, which Wagner attributed to her from a conversation between the two of them made over the lunch recess. The district court then stated,

> As those statements currently are in the record, I believe they could easily be construed by you as somewhat misleading, and so at my request and at my direction, the state is going to recall Mr. Wagner to further clarify and explain that testimony.

Pursuant to the court's instructions, Wagner was recalled as a witness. Wagner testified that Davis had told him the metal detector was broken at the scene. Because the broken metal detector was at the scene, Wagner testified he assumed that Davis remembered him using it but she did not say that in the conversation. Yet, Wagner insisted that he, in fact, used the metal detector at the scene although its extension piece was missing.

Christensen raised the question of prosecutorial misconduct in his motion for a new trial. The district court denied the motion.

**G. Jury Questions During Deliberations.** After the jury commenced deliberations on June 30, the jury asked the district court for clarification of the court's instructions. Specifically, the jury asked, "Could we have further instructions on malice aforethought?" The parties agreed the proper response to this question by the district court should simply be to instruct the jury to follow the instructions previously given.

On July 1, the jury sent a second note stating, "We are stuck between two verdicts and need to know what our options are." With the agreement of the parties, the district court responded they should continue to deliberate if they believed it would be productive in reaching a unanimous verdict.

**H. Motion for a New Trial Based on Jury Misconduct and Bias.**

1. *Introduction.* After the jury returned its verdict, Christensen learned about a Facebook post by "E'ville Amy" made public while the case was still before the jury. In order to understand the context, we reproduce the entirety of the Facebook post in the record:

> There is a lot of anger expressed on this page at the delay in verdict and the possible reasons for the delay. I was told a couple of times at downtown market tonight that there's rumors of a possible riot if it's not a verdict of guilty: first degree murder.
>
> I don't know if the rumors have any substance but I want to use this platform you have grown around my reporting here to say: please. do. not. do. this. This community can not sustain a riot right now. (To be clear, there's never a good time to riot. Peaceful demonstration against injustice ~ yes. That's an inalienable right as an American. But how often have these things become anything but peaceful in our age?)
>
> It won't return Thomas Bortvit to us. It won't bring the clock back to June 5 before the chain of events that caused the shooting. It won't change the fact that another son of our community will go away for a long time. You may in a certain scenario believe it's not long enough, but who can take a stopwatch to the pain of loss–of a life and of what could have been.
>
> If you think some might consider rioting, use your influence to stop them.
>
> It won't bring Thomas back. Alternatively, from what I've observed, being kind to one another will let a little sliver of his spirit shine through, if just for a moment.
>
> We have to live here as family and community for years to come. The only way I can see for the ripped apart places to be whole again is love, peace, compassion, kindness, and understanding.

Christensen moved for a poll of the jury to determine whether the jury verdict might have been tainted by exposure to the Facebook posting or other outside influences. The district court granted the motion. The

district court held proceedings to poll the jury on October 18, 2018, more than three months after the jury rendered its verdict.

2. *Evidence adduced at jury poll.* During the poll, each juror was asked whether they heard or saw any comments in the news media, from social media like Facebook, or from friends in the community that there might be some sort of riot or violence if Christensen was not found guilty of a certain offense. They were also asked whether they heard any discussion by other jurors about a potential riot. Finally, if the answer was yes, the jurors were asked when they heard the discussion or commentary.

The first juror polled, S.G., when asked whether she heard before the jury reached its verdict of a threat of some sort of riot or violence or some kind of public disturbance if Christensen was not found guilty of something, testified, "No, sir, I didn't hear it before we reached our verdict, no." When asked if other jurors made comments along those lines, S.G. stated, "Not that I can recall, no." When pressed, S.G. again stated, "I don't think that it was mentioned before we reached our verdict that I know of." When asked if there was a possibility that such a statement was made by another juror before the verdict was rendered, S.G. testified, "I'm going to say no, there wasn't any that I -- no, not even a possibility in my mind."

The second juror, B.W., testified that he personally did not see or hear anything related to violence outside the jury room but that "[he] did hear in the jury room that some people had seen it on Facebook." When asked what specifically came up, B.W. stated, "[T]here were some threats against the jury depending on what -- whatever decision was made" and that jurors "just said that there are people threatening the jury." B.W. stated the statements were made by two female jurors. When asked at what point in the proceedings the statements were made, B.W. responded,

> I would say it wasn't part of our proceedings at all, you know, as far as the decision we reached, but it was said after that basically hey, could we get somebody to walk us to our vehicles because some of the jurors were feeling like there was, you know, obviously tension in the courtroom, but also that they had seen some things on Facebook.

Further, in response to a question about whether the threats concerned a particular verdict, B.W. replied,

> That's a really good question. I don't think it was dependent on what specific decision was made by the jury, just that there were people on both sides of the issue about whatever the decision would be made, and so that had an impact on, you know, the jury feeling safe.

The third juror, M.S., testified to a lack of knowledge about any possible threat of violence "until after the decision was made." According to M.S., she learned of the threat of violence as an explanation for why the jury was assisted out of the courthouse. M.S. recalled, however, that a comment in the jury room "had been mentioned a few days earlier." M.S. recalled that "the person talked to the judge about it." When the court advised M.S. that it did not remember such a conversation, the juror responded, "[M]aybe we just discussed that maybe we should." M.S. did not remember who the juror was, but testified it was a female juror who "had been told that it was all over Facebook" and who said "[s]omething to the effect that her granddaughter had read it on Facebook." When asked if the comment was made at the conclusion of the evidence, while the jury was deliberating, or before that time, the juror responded, "before that time" and during the course of the trial.

The fourth juror, K.K., testified that she had heard "there had been talk about a riot if [Christensen] wasn't found guilty." When asked where she heard that, she stated, "I just heard it somewhere. I don't know where." She also stated that at the time, she thought it "sounded ridiculous and that was it." She indicated she heard the comment

sometime during the trial. She testified that she heard it out in the public somewhere, that the comment was not directed at her, and that she did not share what she heard with the jury. When asked if she heard other members of the jury talking about something similar, she responded, "Not that I recall."

The fifth juror, T.L., testified that she did not hear of a threat of violence outside the jury room but that one of the other jurors made a comment that "they heard that if [the jury] didn't vote for first degree murder that there was going to be -- people were going to be mad or be outside the courthouse, something to that effect." She did not remember when the comment was made or how many persons heard the comment. She said it was "fairly dismissed."

The sixth juror, J.A., testified that she had not heard of the threat of violence outside the jury room but that it was brought up by a jury member. According to J.A., a juror stated that "someone had told them that if it wasn't first degree that there would be a riot." J.A. recalled the comment was made "after we had made our verdict" but before the verdict was announced in the courtroom.

The seventh juror, K.B., testified that she had not heard of a threat of violence and that she did not remember any such discussion by the jury.

The eighth juror, A.F., testified that she had not heard of the threat of violence outside the jury room but recalled some discussion after the decision had been made and announced in the courtroom. She recalled, "I think somebody said something about a post on Facebook." The juror recalled that the commenting juror received the information about Facebook from someone else. She believed that the sheriff's office

personnel escorted the jurors to their cars because of what the juror had said or heard.

The ninth juror and jury foreperson, G.S., did not hear of any threat of violence outside the jury room. He did recall other jurors stating that they had heard something of that nature. He did not remember if the concern over safety occurred before the verdict or after the verdict, "but the concern was the safety of the jurors after the trial was over." G.S. testified, "I took a survey or a vote to see who was worried about their safety, and most people raised their hands." When asked whether the source of the concern was due to a threat or something else coming from outside the courtroom, or instead was based on the emotional nature of the proceeding, G.S. stated, "I would say the emotional, yeah. It was highly charged. There was a lot of emotional pressure in the jury room, as one might expect, and that was bothersome."

The tenth juror, R.D., testified that she did not hear of a threat of violence outside the jury room. She also did not remember any discussion of a threat of violence inside the jury room.

The eleventh juror, M.H., testified that she did not hear of any threat of violence outside the jury room, but remembers a comment in the jury room that "there might be, like, a possible riot at the courthouse." She testified that the comment was made on Friday prior to the jury resuming deliberations. M.H. recalled that the juror heard about the threat in a telephone conversation, that the source of the information was a family member, and that the juror's comment about a possible riot occurred on a day before the jury returned to the courthouse to deliberate.

The twelfth juror, T.J., testified she did not hear outside the jury room about a riot or some sort of public disturbance if Christensen was not found guilty of something. She did recall such a comment and

discussion by the jury but only after the verdict was announced. She testified that juror A.F. was very emotional, was crying quite a bit, and stated that "she had heard that somebody -- that there was a possible -- going to be a riot." T.J. stated, "[T]hat's all that was said." As a result, T.J. testified the jury asked to have deputies walk them out of the courthouse.

At the close of the polling of the jurors, the district court made a statement on the record. The district court said statements were made to the court after trial that the

> jurors, based on their belief that this obviously was an emotionally charged case from what they had seen in the courtroom, their concerns over all of the family members and the public that had been here during the course of the trial, [and] that they could be confronted by those individuals upon leaving the courthouse, . . . requested safety escorts.

> There was absolutely no statement made to [the court] about anybody seeing anything on Facebook, social media, or having heard anything out in the community that would have led to them having those safety concerns.

3. *District court ruling on motion for a new trial.* In his motion for a new trial, Christensen argued that the record established juror misconduct and jury bias. The district court denied relief.

In its posttrial ruling, the district court summarized the testimony of the jurors. The district court considered whether the jurors saw or heard about the E'ville Amy Facebook post outside the courthouse. The district court noted that none of the jurors testified they saw or read the Facebook posting by E'ville Amy.

The district court considered the question of when the jury heard about the possibility of public violence. The district court noted that five jurors acknowledged they heard about the possibility of a riot or public violence from another juror if a certain verdict was not reached. But,

according to the district court, only one juror could recall which juror made the statement. The district court also observed that one juror heard about a possible riot in the community but called it "ridiculous."

Further, the district court stated three jurors testified they did not recall any discussion of public violence and two other jurors believed the jurors' safety concerns were due, at least in part, to the tension in the courtroom between friends and family members of the Christensen and Bortvit families. The district court noted the jury foreperson, G.S., took a survey of the jurors to see if they felt unsafe after their verdict had been read, and when a majority of jurors raised their hands, the court was notified of the concern. When the court was informed of the jury's concern after the verdict was rendered, the court stated that no mention was made about comments on Facebook or about someone having heard something that led the jurors to perceive a threat to their safety.

The district court further observed three jurors testified that the possibility of a public disturbance or public violence had been brought up by another juror during the course of the trial and before the jury reached its verdict. These three jurors, however, could not recall who brought up the issue. Two of the three jurors, the court noted, could not recall when the juror commented on the possibility of violence.

After summarizing the jurors' testimony, the district court applied a multifactor test set forth in *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984), *abrogated on other grounds by Ryan v. Arneson,* 422 N.W.2d 491, 495 (Iowa 1988), to determine whether to grant Christensen a new trial based on juror misconduct. Based on its review of the record, the district court concluded Christensen failed to meet the *Cullen* test.

To determine whether to grant Christensen a new trial based on juror bias, the district court considered *State v. Webster*, 865 N.W.2d 223,

236–39 (Iowa 2015). The court held Christensen did not meet his burden of showing juror bias.

## II. Discussion of Juror Disqualification.

**A. Introduction.** Christensen seeks a new trial because of the alleged bias of juror K.B. Iowa Rule of Criminal Procedure 2.24(2)(*b*)(9) provides that a court may grant a new trial when "the defendant has not received a fair and impartial trial." As we noted in *Webster,* "a jury consisting of eleven impartial jurors and one actually biased juror is constitutionally infirm without any showing that there was juror misconduct." 865 N.W.2d at 237 n.7.

**B. Positions of the Parties.**

1. *Christensen's position.* Christensen claims the district court committed reversible error when it refused to disqualify juror K.B. for potential bias. He contends that while a district court decision denying a motion for new trial is ordinarily reviewed for an abuse of discretion, we review fact-finding de novo when constitutional issues are involved.

Christensen emphasizes the language used by K.B. when pressed about whether she had made any out-of-court statement declaring Christensen guilty. Christensen points out that K.B.'s answers when asked about making statements about Christensen's guilt or innocence were guarded and circumspect: "I don't *believe* I did" and "I don't *think* I ever said anything about his guilt or innocence." (Emphasis added.)

In support of his argument, Christensen cites *State v. Beckwith,* 242 Iowa 228, 238–39, 46 N.W.2d 20, 26 (1951), *abrogated on other grounds by State v. Neuendorf,* 509 N.W.2d 743, 746 (Iowa 1993). In *Beckwith,* this court cautioned that "trial courts should use the utmost caution in overruling challenges for cause in criminal cases when there appears to be a fair question as to their soundness." *Id.* at 238, 46 N.W.2d at 26. The

*Beckwith* court noted that while a ruling might be technically sound, "it is far better to give the accused the benefit of the doubt." *Id.* at 239, 46 N.W.2d at 26.

2. *The State's position.* The State counters that the standard to be applied to a question of juror disqualification is abuse of discretion. *Webster*, 865 N.W.2d at 231. The State recognizes an abuse of discretion occurs when a district court order is based on an erroneous application of law. *See State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001). And, even if the case involves a constitutional question subject to de novo review, the State emphasizes that the reviewing court gives some deference to credibility determinations made by the district court. *See State v. Carter*, 696 N.W.2d 31, 36 (Iowa 2005).

The State urges us to examine the record made regarding the motion to disqualify K.B. The State notes that K.B. repeatedly stated she had not come to a decision regarding the guilt or innocence of the accused. Further, the State notes there was no factual showing the juror actually stated at a family event that she believed the defendant was guilty.

**C. Discussion.** On the issue of juror disqualification, we do not decide whether the standard of review is de novo or abuse of discretion. As in *Webster*, we generally agree with the fact-finding of the district court. 865 N.W.2d at 231 n.4.

Christensen's cited case of *Beckwith* provides sound advice to the district court, namely, that it makes practical sense to error on the side of caution on a question of jury disqualification. In this case, there were two alternate jurors available to take the place of a dismissed juror.

Yet, the *Beckwith* advice to judges to be cautious when there is a close question of disqualification for cause does not alter the requirement that the defendant establish a sufficient basis to support disqualification

of a juror. Here, there was no direct evidence the juror actually made the alleged statements about Christensen's guilt. Rather, there was only an anonymous note summarizing a coffee shop discussion. No one testified that juror K.B. actually made the statements attributed to her in the anonymous coffee shop note. The qualified language used by the juror when she was questioned about the alleged statement, of course, is a factor, and in some cases might be an important factor,[1] but here, the evidence that she actually made the potentially disqualifying statements attributed to her is hearsay upon hearsay and generally denied by the juror. Had credible testimony been offered showing that K.B. did, in fact,

[1]Social science research suggest that the language actually used by a witness provides a much better barometer of credibility than witness demeanor, which is often misleading. In two pioneering articles, legal academics reviewing the social science literature explain that visual cues are significantly worse than language content in assessing credibility. Jeremy A. Blumenthal, *A Wipe of the Hands, a Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility*, 72 Neb. L. Rev. 1157, 1203 (1993) ("[R]esearch has shown that observers exposed to a witness' voice are able to judge deceit best, and those exposed to merely a transcript and no 'demeanor cues' do almost as well, up to twice as well as those who are exposed to visual cues. Thus, there is support for the claim that findings of credibility could be reviewed de novo by appellate courts." (Footnote omitted.)); Olin Guy Welborn III, *Demeanor*, 76 Cornell L. Rev. 1075, 1075, 1104–05 (1991) ("According to the empirical evidence, ordinary people cannot make effective use of demeanor in deciding whether to believe a witness. On the contrary, there is some evidence that the observation of demeanor diminishes rather than enhances the accuracy of credibility judgments. . . . To the extent that people can detect lying or erroneous beliefs in another, they do so primarily by paying close attention to the content of what the other says, not by observing facial expression, posture, tone of voice, or other nonverbal behavior."). Later research has confirmed the accuracy of those two articles and further explains how juror biases and information asymmetry can affect lie detection. Max Minzner, *Detecting Lies Using Demeanor, Bias, and Context*, 29 Cardozo L. Rev. 2557, 2558, 2578 (2008). Relying on the social science research, courts have expressed unease with dependence on demeanor evidence to assess credibility because of its tendency to mislead. *See, e.g., United States v. Pickering*, 794 F.3d 802, 805 (7th Cir. 2015) ("[D]emeanor evidence, such as tone of voice, or gestures or posture, can be an unreliable clue to truthfulness or untruthfulness, and thus distract a trier of fact from the cognitive content of a witness's testimony."); *United States v. Shonubi*, 895 F. Supp. 460, 481 (E.D.N.Y. 1995) ("Gauging credibility is the best known application of demeanor. Ironically, this may be one of its least effective uses."), *vacated on other grounds*, 103 F.3d 1085 (2d Cir. 1997); *State v. Rogerson*, 855 N.W.2d 495, 509–10 (Iowa 2014) (Hecht, J., concurring specially) (explaining that "intuitive assumptions" that physical distance and vision-blocking screens between a witness and defendant "bear[] on the assessment of reliability may be true, but maybe not").

make the statements attributed to her, we would have a different scenario. In light of the record developed in this case, however, we decline to disturb the ruling of the district court.

### III. Discussion of Prosecutorial Misconduct.

### A. Positions of the Parties.

1. *Christensen's position.* Christensen asserts the district court erred in failing to grant him a new trial based upon prosecutorial misconduct. *See State v. Graves*, 668 N.W.2d 860, 867 (Iowa 2003); *State v. Piper*, 663 N.W.2d 894, 913 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010). Christensen argues prosecutorial misconduct occurred when the State elicited testimony from Tara Scott that the physical evidence was available for testing by others. In support of that claim he cites *Hanes*, 790 N.W.2d at 556. In *Hanes*, we held that the state bears the burden of proof in a criminal prosecution and that it was improper for the state to attempt to shift the burden to the defense by suggesting that the defense could have called additional witnesses. *Id.*

Christensen recognizes the district court sustained his objection to the Scott testimony and instructed the jury to disregard the question and the answer. According to Christensen, however, this was a case in which the proverbial bell, when once rung, cannot be unrung. *See State v. Jackson*, 587 N.W.2d 764, 766 (Iowa 1998) ("[A] reversal may only be predicated on the proposition that the matter forbidden by the ruling was so prejudicial that its effect upon the jury could not be erased by the trial court's admonition."); *State v. Williamson*, 570 N.W.2d 770, 771 (Iowa 1997) (same).

Christensen also cites the testimony of Peter Wagner as establishing prosecutorial misconduct. According to Christensen, Wagner's testimony

that a metal detector was used by investigators at the Christensen farm was false and misleading. According to Christensen, a prosecutor's use of false testimony violates due process. *See DeVoss v. State*, 648 N.W.2d 56, 64 (Iowa 2002). Christensen notes the district court observed that Wagner's testimony "bordered on the reckless." Yet Christensen recognizes the court admonished the jury that Wagner's testimony was misleading and provided Wagner with an opportunity to "clarify" his testimony.

2. *The State's position.* The State counters there was no prosecutorial misconduct and, to the extent any may have occurred, it was cured by the actions taken by the district court. On the question of whether it was improper for Scott to testify that evidence was available for testing by others, the State does not discuss *Hanes* but instead relies on the earlier case of *State v. Craig*, 490 N.W.2d 795, 797 (Iowa 1992). In *Craig*, we stated that "a prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, so long as it is not phrased to call attention to the defendant's own failure to testify." *Id.* (emphasis omitted) (quoting *State v. Bishop*, 387 N.W.2d 554, 563 (Iowa 1986)).

With respect to the Wagner testimony, the State maintains Christensen failed to show the testimony about the telephone conversation with Davis was false, as neither Wagner nor Davis remembered what was specifically said. Further, the State suggests the prosecution had another witness who testified that Wagner used a metal detector.

In any event, in order for prosecutorial misconduct to be present, the State argues, Christensen must show that the State *knew* the testimony was false and that the false testimony was material to the case. *See Hamann v. State*, 324 N.W.2d 906, 909 (Iowa 1982). The State asserts

that Christensen failed to show that the State knew the testimony was false and that the dust-up over whether a metal detector was used to locate metal objects at the Christensen farm is not the kind of question that would influence the verdict in this case.

**B. Discussion.** We conclude the State has the better argument with respect to the prosecutorial misconduct claim arising out of the Scott testimony. Her testimony crossed the line established in *Hanes*, a case which the State declined to address. Yet, upon objection, the district court excluded the evidence and directed the jury to disregard it.

We do not think the error was so serious to require a mistrial. We have said that a prosecutor's misconduct will not warrant a new trial unless the conduct was so prejudicial as to deprive the defendant of a fair trial. *State v. Pace*, 602 N.W.2d 764, 774 (Iowa 1999). We have noted that "[p]rejudice can, but usually does not, result from isolated prosecutorial misconduct." *State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989). Here, the prosecutorial misconduct was an isolated event and was not as prejudicial as, say, a comment on the defendant's failure to testify in his or her own defense.

Further, as both parties recognize, we have stated curative instructions are generally sufficient to cure most trial errors. *See State v. Plaster*, 424 N.W.2d 226, 232 (Iowa 1997). Here, the improper question, the answer, the motion to strike, and the curative instruction happened in rapid succession. The testimony stricken was not of a startling or flamboyant nature that was likely to make an indelible impression on the jury. We think the district court's response to the timely objection at trial provided an adequate remedy to Scott's inappropriate testimony.

We also reject Christensen's assertion that he is entitled to a new trial based upon Wagner's alleged misconduct. The district court found

Wagner's testimony regarding his conversation with Davis troubling, and so do we. But the record does not support a conclusion the State was aware, or should have been aware, of a plan by Wagner to present false testimony. *See Hamann*, 324 N.W.2d at 909. Further, Wagner returned to the stand to clarify his prior misleading testimony about his conversation with Davis. Ultimately, the jury was not materially misled, and Wagner's credibility was clearly damaged by his misstep. This singular event on a collateral issue does not provide the basis for a new trial.

**IV. Discussion of Jury Misconduct and Bias.**

**A. Introduction.** The Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 9 and 10 of the Iowa Constitution guarantee a criminal defendant the right to a fair trial before an impartial jury. U.S. Const. amends. VI, XIV; Iowa Const. art. I, §§ 9, 10; *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961). The jury is constitutionally required to base its verdict on the evidence developed at trial. *Irvin*, 366 U.S. at 722, 81 S. Ct. at 1642. The partiality of one juror due to extraneous influence is sufficient to deny the defendant the constitutional guarantee of an impartial trial. *Parker v. Gladden*, 385 U.S. 363, 366, 87 S. Ct. 468, 471 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."); *Webster*, 865 N.W.2d at 237 n.7 ("[A] jury consisting of eleven impartial jurors and one actually biased juror is constitutionally infirm . . . .").

The constitutional right to an impartial jury may be impaired by jury misconduct and jury bias. The concepts of juror misconduct and juror bias are often related but are somewhat different in nature. *Webster*, 865 N.W.2d at 232. Juror misconduct often involves communication by a juror with others about the case outside the jury room, independently

investigating the crime, or engaging in independent research on questions of law or fact. *Id.* Juror bias, on the other hand, does not necessarily involve juror misconduct, but arises when a juror is unable to fairly engage in a determination of guilt or innocence based on the evidence at trial and the court's instructions. *Id.*

Under our rules of criminal procedure, a defendant may be entitled to a new trial when the jury "have been guilty of any misconduct tending to prevent a fair and just consideration of the case." Iowa R. Crim. P. 2.24(2)(*b*)(3). Our rules also provide for a new trial if "the jury has received any evidence . . . not authorized by the court." *Id.* r. 2.24(2)(*b*)(2). Finally, our rules provide that a new trial may be granted when "the defendant has not received a fair and impartial trial." *Id.* r. 2.24(2)(*b*)(9).

Also relevant is Iowa Rule of Evidence 5.606(*b*). Under this rule, a juror is generally prohibited from testifying about jury deliberations except a juror may testify about whether any extraneous information was improperly brought to the attention of the jury. *Id.*

**B. Positions of the Parties.**

1. *Christensen's position.* Christensen argues that he is entitled to a new trial based on jury misconduct and jury bias. He cites the authority to grant a new trial in Iowa Rules of Criminal Procedure 2.24(2)(*b*)(2), (2)(*b*)(3), and (2)(*b*)(9). Christensen argues that although a denial of a motion for new trial based upon juror misconduct or juror bias is reviewed for an abuse of discretion, we review fact-finding de novo when constitutional issues are involved.

The thrust of his claim is that a juror or jurors learned from sources outside the jury there might be a riot at the courthouse in the event the jury did not return a certain verdict. The juror or jurors then told other

jurors of the possibility of a riot. Christensen claims these events prevented him from getting a fair trial.

In pressing his claim, Christensen urges us to apply a test presented in *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954). In *Remmer,* the Supreme Court stated that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* The *Remmer* Court noted that "[t]he presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.* The case was remanded to allow the government to attempt to meet its burden. *Id.* at 230, 74 S. Ct. at 451–52.

Christensen cites a number of federal circuit court cases in support of a relatively stringent test. For instance, Christensen cites *United States v. Dutkel,* 192 F.3d 893, 897–98 (9th Cir. 1999), *abrogated on other grounds by Godoy v. Spearman*, 861 F.3d 956, 968 n.6 (9th Cir. 2017) (en banc). In *Dutkel,* the United States Court of Appeals for the Ninth Circuit held that a prima facie showing of jury tampering triggered a presumption of prejudice and that the court should inquire whether "the intervention interfered with the jury's deliberations by distracting one or more of the jurors, or by introducing some other extraneous factor into the deliberative process." *Id.* at 897. Christensen cites several additional cases for the proposition that the court should engage in stringent review when there are claims of external influence on a jury. *See United States v. Rutherford*, 371 F.3d 634, 644 (9th Cir. 2004) ("The appropriate inquiry is whether the unauthorized conduct 'raises a risk of influencing the verdict,' or 'had an adverse effect on the deliberations.'" (first quoting *Caliendo v. Warden of*

*Cal. Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004); and then quoting *United States v. Henley*, 238 F.3d 1111, 1117 (9th Cir. 2001)); *United States v. Tucker*, 137 F.3d 1016, 1031 (8th Cir. 1998) ("The question of prejudice depends on whether 'there is any reasonable chance that the jury would have been deadlocked or would have reached a different verdict but for the fact that even one reasonable juror was exposed to prejudicial extraneous matter.'" (emphasis omitted) (quoting *United States v. Hall*, 116 F.3d 1253, 1255 (8th Cir. 1997)); *United States v. Cheek*, 94 F.3d 136, 144 (4th Cir. 1996) (granting relief where one juror, exposed to bribery attempt, was "devastated and fearful").

Christensen also urges us to apply a "heightened scrutiny" test adopted in *State v. Carey*, 165 N.W.2d 27, 30 (Iowa 1969). In *Carey*, we considered, among other issues, the impact of a sign in the jury room indicating that the coffee was being jointly provided by the county clerk and the county attorney. *Id.* at 28. We emphasized, "Our anxiety to protect the jury from any conduct which would lessen public confidence in our judicial system should be even greater in a criminal trial." *Id.* at 30. Citing the coffee sign and other errors, we reversed the conviction. *Id.* Christensen argues that the heightened scrutiny afforded by *Carey* in criminal cases was recognized in *Cullen*, 357 N.W.2d at 27.

Applying heightened scrutiny under *Remmer* or *Carey*, Christensen argues, he is entitled to a new trial because of juror misconduct. Christensen asserts that the misconduct arose when jurors received external information about the possibility of a riot if a certain verdict was not returned and when this information was communicated to the jury during their deliberations.

Christensen canvasses the record developed in the jury poll to support his mistrial motion. Christensen notes that one juror testified

that *two* jurors had seen a Facebook post indicating that people were threatening violence depending on what decision the jury made. He emphasizes testimony that those two jurors saw postings about violence against the *jury*. Viewing Facebook postings about the trial, according to Christensen, would violate the instructions of the court to avoid contact with social media. Christensen notes that one juror testified that another juror told the jury that she had overheard talk in the community about a riot if the defendant was found not guilty.

The misconduct continued, Christensen asserts, when the jurors shared the extraneous information with other members of the jury. Christensen observes the jury poll demonstrated that nine of the twelve jurors were aware of the potential threat. He further notes that one juror testified that comments were made about the threat a few days before the verdict was rendered and before the conclusion of evidence. In addition, he points out, two jurors recalled that another juror had spoken by telephone with a family member about the riot threat before the jury returned to continue its deliberations on Friday.

Christensen argues the threat had an impact on the jurors' concern for their own safety. Christensen cites the testimony of the jury foreperson who stated that after the verdict was rendered, he took a poll of jurors and a majority raised their hands when asked whether they were concerned about their personal safety. Christensen points out juror testimony that the perceived threat played a role in the jury's request for a police escort when jurors walked to their cars after rendering their verdict. Another juror, he notes, recalled being told the threat was "all over Facebook" and that this threat was the reason the jury was led out of the courthouse. Christensen also directs our attention to a third juror's testimony concerning a juror who heard of the threat and was very emotional and

upset. He further points out that one juror was sufficiently alarmed about her safety to ask the sheriff to patrol her home after the conclusion of the trial.

Christensen cites two cases from other jurisdictions in which threats of public violence gave rise to a change in venue. In *Lozano v. State*, 584 So. 2d 19, 22 (Fla. Dist. Ct. App. 1991) (per curiam), the Florida appellate court held that the district court erred in failing to grant a change of venue in a police shooting case that had attracted media attention and caused a Miami neighborhood to erupt into civil disturbance. The *Lozano* court noted that several jurors were affected by the fear of violence and that several had heard from friends or relatives that there might be a disturbance if the defendant was found guilty. *Id.* at 22 n.5. The Florida court stated,

> Surely, the fear that one's own county would respond to a not guilty verdict by erupting into violence is as highly "impermissible [a] factor" as can be contemplated. Surely too, there was an overwhelmingly "unacceptable risk" of its having adversely affected Lozano's—and every citizen's—most basic right under our system: the one to a fair determination of his guilt or innocence based on the evidence alone.

*Id.* at 22–23 (quoting *Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 1693 (1976)).

Christensen also cites *Powell v. Superior Court*, 283 Cal. Rptr. 777, 787 (Ct. App. 1991). In this case, the California appellate court confronted a situation in which white police officers were charged with assaulting Rodney King, an African-American man. *Id.* at 778–80. In granting a change of venue, the *Powell* court noted that "[it] must draw the inevitable inference about the possibility of threats which would surface during the trial itself." *Id.* at 787. The *Powell* court found the possibility of threats of violence would "add another impermissible factor into the boiling cauldron

surrounding this case, making it imperative to take every step possible to ensure that an impartial unbiased jury be seated." *Id.*

Under the circumstances here, Christensen contends there is no doubt that one or more jurors were exposed to the Facebook posting about a potential riot and that some of the jurors were exposed to this information as early as days before deliberation and certainly before the verdict was rendered. The jury poll, he notes, revealed that nine of the jurors were aware of discussion of a possible riot in the community if a certain verdict was not rendered, that one of them was emotionally upset about it, that the jury poll taken immediately after the verdict was rendered revealed sufficient concern that law enforcement escorted the jury from the courtroom, and that one of the jurors asked to have her home patrolled after the verdict was rendered.

Christensen presses that the extraneous information about a potential riot was calculated to, and with reasonable probability did, influence the verdict. While Christensen recognizes the district court noted that two jurors commented that they considered the threats "ridiculous" or "fairly dismissed," such consideration was impermissible under Iowa Rule of Evidence 5.606(*b*). Christensen urges us to instead consider objectively the potential impact on the jury verdict. *See State v. Henning*, 545 N.W.2d 322, 325 (Iowa 1996). Noting twenty-four of sixty prospective jurors were disqualified for cause, Christensen argues that the case involved a star athlete killing a popular college student that generated community sentiment. If even one juror was not impartial as a result of the possibility of a riot, Christensen argues he is entitled to a new trial. *See Parker*, 385 U.S. at 365–66, 87 S. Ct. at 471; *Webster*, 865 N.W.2d at 237 n.7.

2. *The State's position.* The State suggests the proper standard of review for juror misconduct is abuse of discretion, citing *Webster*, 865 N.W.2d at 231. The State again recognizes, however, that an erroneous application of law is an abuse of discretion. *Rodriquez*, 636 N.W.2d at 239. The State also cites *Carter*, 696 N.W.2d at 36, a case involving de novo review of constitutional issues, for the proposition that even when constitutional issues are involved, the court on appeal gives deference to findings of fact because of the district court's ability to assess the credibility of witnesses.

The State asserts that in seeking a new trial based on juror misconduct, a defendant must satisfy the multipronged approach outlined in *Cullen*, 357 N.W.2d at 27, and utilized in *Webster*, 865 N.W.2d at 235–36. First, the evidence bearing on misconduct must be based only on objective facts as to what occurred. *Webster*, 865 N.W.2d at 234. Second, "the acts or statements complained of must exceed tolerable bounds of jury deliberation." *Id.* (quoting *Cullen*, 357 N.W.2d at 27). Third, "it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict." *Id.* (quoting *Cullen*, 357 N.W.2d at 27).

In canvassing the jury poll record, the State argues there was no juror misconduct. The State asserts the evidence revealed that one juror apparently spoke to her granddaughter and the granddaughter—not the juror—saw the threat on Facebook. Another juror, according to the State, simply heard a community member comment about a threat to the jury's safety. The State notes there was no evidence that a juror saw the threat by violating the court's instruction against viewing material on social media. The State discounts the testimony of the juror who stated that two jurors had directly seen the threat on Facebook.

The State further recognizes that in *State v. Johnson*, 445 N.W.2d 337, 342 (Iowa 1989), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269, 274–75 (Iowa 2016), we held that outside information relayed to the jury before or during jury deliberations exceeds the permissible bounds of jury deliberation. In *Johnson*, a juror told other jurors that one of the defendant's victims "broke down" and cried in front of a teacher at school. *Id.* at 339. The juror also told other jurors that he had heard rumors the defendant hit the victims. *Id.* The State, however maintains that *Johnson* does not apply here because the district court concluded from its credibility findings that no juror discussed the threat during jury deliberations.

Further, the State argues there was no reasonable probability the threat to the jurors' safety affected the verdict. The State relies on statements from some jurors that the threat was "ridiculous" and "fairly dismissed." While one juror was described as being upset, the State argues she did not hear of the threat until after the verdict. Finally, the State claims the jurors' request for a police escort upon leaving the courthouse was attributed to all the family members and public attending the trial and a desire to avoid confrontation when leaving the courthouse.

Finally, the State argues there was no reasonable probability that the jury's verdict was impacted because the State's evidence was so strong. The State notes the defendant admitted at trial, and to both his parents prior to trial, that he shot the victim. The State further notes other evidence, such as the gun retrieved from the defendant's home and his bloodstained pants and boots, supports the second-degree murder verdict. Finally, the State contends the evidence at trial established the defendant was upset with his ex-girlfriend.

### C. Proper Framework for Evaluating Juror Misconduct.

1. *Introduction.* The first issue we must resolve is the proper legal framework for determining whether a reversible case of jury misconduct is present. A district court that misapplies the legal test commits reversible error. *Rodriquez*, 636 N.W.2d at 239. If the district court applied the correct test, the second issue that arises is the proper standard of review on appeal. Once we have determined the proper legal standard and the standard of review to be applied on appeal, we can then apply the law to the facts of this case.

In considering these questions, we recognize there are two competing interests in considering how to handle juror misconduct. On the one hand, a core tenet of our system of government, enshrined in the right to counsel and due process provisions of the Iowa and United States Constitutions, is the notion that criminal convictions are imposed only by a fair and impartial jury based solely on the evidence. *See* James W. Diehm, *Impeachment of Jury Verdicts:* Tanner v. United States *and Beyond*, 65 St. John's L. Rev. 389, 393 (1991) [hereinafter Diehm].

On the other hand, intrusive inquiries into jury deliberations could undermine right-to-counsel and due process goals. *See id.* If jurors understand the public will have access to deliberations, they may be more controlled by perceptions of public opinion than the evidence at hand. *See id.* at 438; Note, *Public Disclosures of Jury Deliberations*, 96 Harv. L. Rev. 886, 894 (1983). As a result, jury privacy is essential to public confidence in the verdict. *Tanner v. United States*, 483 U.S. 107, 120–21, 107 S. Ct. 2739, 2748 (1987). Further, there is an interest in finality. *Id.* at 120, 107 S. Ct. at 2747. Attacking verdicts, sometimes years later, may put the prosecution at a disadvantage as memories fade, witnesses become unavailable, and evidence is lost. Diehm, 65 St. John's L. Rev. at 402.

Yet, few would argue that finality considerations trump the need to avoid miscarriages of justice that may occur if a defendant is tried by a partial jury.

The task is complicated by our evolving rules of evidence. Under Federal Rule of Evidence 606(b) and its Iowa counterpart, Iowa Rule of Evidence 5.606(*b*), a court is generally prohibited from inquiring into jury deliberations. Although inquiry into precisely what extraneous information was presented to a juror or jurors is permissible, exploration of the actual impact on jurors by asking them how the extraneous information impacted the deliberations and verdict is off limits. *See United States v. Williams-Davis*, 90 F.3d 490, 496 (D.C. Cir. 1996); *State v. Wilson*, 878 N.W.2d 203, 210 (Iowa 2016). Further, the passage of time can be problematic on record development. *See Moore v. Knight*, 368 F.3d 936, 941–42 (7th Cir. 2004) ("[I]t is ridiculous to base such a determination [of whether or not there was prejudice] on the predictable lack of evidence so many years after the fact."). Because of the barriers presented by evidentiary rules, and often by the passage of time, questions of what presumptions and burdens of proof apply under various circumstances are critical to case outcomes when assessing whether extraneous influences prevented the defendant from receiving a fair trial.

And there is a further complication, namely, the era of the Internet. Because of the Internet, the likelihood of jurors receiving extraneous information has exponentially increased. *See* Bennett L. Gershman, *Contaminating the Verdict: The Problem of Juror Misconduct*, 50 S.D. L. Rev. 322, 324 (2005). In June 2013, Wikipedia had almost eight billion page views. Anna H. Tison, United States v. Lawson*: Problems with Presumption in the Fourth Circuit*, 91 N.C. L. Rev. 2244, 2244 (2013). A low threshold for court intervention could significantly impact the stability of verdicts.

In the end, it would be difficult to argue that verdicts could never be impeached as a result of injection of extraneous information into the jury process. On the other hand, setting the bar too low could well backfire and could impose unacceptable costs that are at best weakly linked to trial outcomes. As is often the case in the law, it is a delicate balance.

2. *Competing approaches to extraneous influences on jurors in United States Supreme Court caselaw.* We begin with a discussion of a thread of four United States Supreme Court cases dealing with the right to an impartial jury. As will be seen, the cases are at least somewhat inconsistent and have led to a variety of permutations in the lower federal courts.

The first significant case is the capital murder case of *Mattox v. United States*, 146 U.S. 140, 13 S. Ct. 50 (1892). In *Mattox*, jurors submitted affidavits posttrial indicating the bailiff had discussed the case with the jury and a newspaper article related to the case was read to the jury. *Id.* at 142–43, 13 S. Ct. at 51. The bailiff had told the jury that the deceased in the case was the defendant's third victim. *Id.* at 142, 13 S. Ct. at 51. The newspaper article stated this was the defendant's second trial, the evidence against him was "very strong," and "friends of Mattox gave up all hope of any result but conviction." *Id.* at 143, 13 S. Ct. at 51–52.

The *Mattox* Court addressed the question of what evidence should be considered in impeaching the jury's verdict. The *Mattox* Court stated that a member of the jury could testify on the question of the existence of any extraneous influence, although not as to how far that influence operated upon the juror's mind. *See id.* at 149, 13 S. Ct. at 52–53. At least in capital cases, the *Mattox* Court declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons . . . are absolutely forbidden, and invalidate the verdict, at least unless their

harmlessness is made to appear." *Id.* at 150, 13 S. Ct. at 53. In support of the notion that extraneous communications were "absolutely forbidden," the *Mattox* Court cited state court cases from Michigan and Kansas. *Id.* (citing *State v. Snyder*, 20 Kan. 306, 308–10 (1878); *People v. Knapp*, 3 N.W. 927, 929–31 (Mich. 1879)). Although there were other bases for reversal, the unanimous *Mattox* Court made clear the extraneous influence introduced to the jury in this case would have been reversible error as well. *Id.* at 151, 13 S. Ct. at 53.

The next case in the thread is *Remmer*, 347 U.S. 227, 74 S. Ct. 450, decided more than fifty years after *Mattox*. In *Remmer*, the defendant was charged with, and convicted of, willful evasion of federal income taxes. *Id.* at 228, 74 S. Ct. at 450. The defendant learned after trial that an unnamed person told the jury foreman that the foreman could profit by bringing in a verdict favorable to the defendant. *Id.* at 228, 74 S. Ct. at 450–51. The juror reported the incident to the judge, who informed the prosecution but not the defense. *Id.* at 228, 74 S. Ct. at 451. The FBI then conducted an investigation and produced a report, which was considered by the judge and the prosecutors alone. *Id.* The judge and prosecution again considered the matter without the defense and, in light of the FBI report, concluded that "the statement to the juror was made in jest." *Id.*

After trial, the defendant moved for a new trial. *Id.* His attorneys asserted that if they had known of the investigation, they would have moved for a mistrial and requested that the juror in question be replaced by an alternate juror. *Id.* at 228–29, 74 S. Ct. at 451. The district court, without holding a hearing, denied the motion, and the D.C. Circuit affirmed. *Id.* at 229, 74 S. Ct. at 451.

The *Remmer* Court, in a brief unanimous opinion by Justice Minton, vacated the appellate decision and remanded to the district court. *Id.* at 230, 74 S. Ct. at 451–52. In a criminal case, the *Remmer* Court noted that

> any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* at 229, 74 S. Ct. at 451. In connection with the presumption of prejudice, the *Remmer* Court stated, "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id.*

The *Remmer* Court further emphasized that sending an FBI agent during a trial to investigate a juror concerning his conduct "is bound to impress the juror and is very apt to do so unduly." *Id.* The *Remmer* Court stressed that a juror must be free to participate in deliberations "without the F.B.I. or anyone else looking over his [or her] shoulder." *Id.*

In this noncapital case, the Supreme Court did not use the absolute terms of *Mattox* but instead established a rebuttable presumption that could be overcome by the state only on a showing that the extraneous influence was harmless. *Id.* The *Remmer* Court directed the district court to hold a hearing on harm to the defendant and explained that if harm was found the district court should grant a new trial. *Id.* at 230, 74 S. Ct. at 451–52. When the case returned, the Court reviewed the transcript developed in the district court on remand, concluded that the juror appeared to be under psychological pressure due to the bribe offer, and remanded for a new trial. *Remmer v. United States*, 350 U.S. 377, 381–82, 76 S. Ct. 425, 427–28 (1956).

Thirty years after *Remmer,* the United States Supreme Court considered a question of juror bias in the case of *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940 (1982). Phillips was convicted of two counts of murder and one count of attempted murder. *Id.* at 210, 102 S. Ct. at 942. He learned that during trial a juror was an active job applicant for a position as a major felony investigator with the district attorney's office. *Id.* at 212, 102 S. Ct. at 943. Members of the district attorney's office, including the two attorneys actually prosecuting Phillips, learned of the application more than a week before the end of Phillips's trial but elected not to advise the court or the defendant. *Id.* at 212–13, 102 S. Ct. at 943–44. After trial, the district attorney learned of the application and informed the court and defense attorneys. *Id.* at 213, 102 S. Ct. at 944.

Upon learning of the juror's employment application, the defendant moved to set aside the verdict. *Id.* The trial court denied the motion, finding that while the application was an "indiscretion," it "in no way reflected a premature conclusion as to [Phillips's] guilt, or prejudice against [Phillips], or an inability to consider the guilt or innocence of [Phillips] solely on the evidence." *Id.* at 213–14, 102 S. Ct. at 944.

Phillips sought federal habeas corpus relief. *Id.* at 214, 102 S. Ct. at 944. The district court imputed bias to the juror because "the average [person] in [the juror's] position would believe that the verdict of the jury would directly affect the evaluation of his job application." *Id.* (quoting *Phillips v. Smith*, 485 F. Supp. 1365, 1371–72 (S.D.N.Y. 1980)). The district court decreed that Phillips should be released unless granted a new trial within ninety days. *Id.* The Second Circuit affirmed by a divided vote, noting that "it is at best difficult and perhaps impossible to learn from a juror's own testimony after the verdict whether he was in fact 'impartial.'" *Id.* (quoting *Phillips v. Smith*, 632 F.2d 1019, 1022 (2d Cir.

1980)).  The Second Circuit relied on the failure of the prosecutors to timely disclose the potential problem as violating due process in reversing the conviction.  *Id.*

Before the Supreme Court, Phillips argued that the Court could not possibly rely solely upon the testimony of the juror in question.  *Id.* at 215, 102 S. Ct. at 945.  The defendant argued that it would be impossible for him to prove the degree of bias through a *Remmer*-type hearing and that a conclusive presumption should arise under the facts of the case.  *Id.*

In an opinion by Justice Rehnquist, a divided Supreme Court rejected the notion that the juror's employment application itself was sufficient to establish the basis for a new trial.  *See id.* at 217, 102 S. Ct. at 946.  Instead, the majority held the proper approach was a *Remmer*-type hearing "in which the defendant has the opportunity to prove actual bias."  *Id.* at 215, 102 S. Ct. at 945.  The *Phillips* majority, therefore, may have suggested it was departing from *Remmer* both on the issue of presumption and the harmless error standard required to overcome the presumption.

In a concurring opinion, Justice O'Connor noted that "whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."  *Id.* at 221–22, 102 S. Ct. at 948 (O'Connor, J., concurring).  Nonetheless, in most cases, Justice O'Connor concluded that a posttrial hearing would be adequate to determine whether a juror is biased.  *Id.* at 222, 102 S. Ct. at 948.  Yet, Justice O'Connor recognized that in some instances the use of a conclusive presumption might be justified.  *Id.*

Justice Marshall, joined by Justices Brennan and Stevens, dissented.  *Id.* at 224, 102 S. Ct. at 949 (Marshall, J., dissenting).  Justice

Marshall emphasized that "[t]he right to a trial by an impartial jury lies at the very heart of due process." *Id.* at 224, 102 S. Ct. at 950. In his view, the majority erred in concluding that Phillips's right to an impartial trial was adequately protected by a postevidentiary hearing to determine whether the jury was actually biased. *Id.* at 228, 102 S. Ct. at 952. According to Justice Marshall, the probability of bias in the case arising from pursuit of employment was high yet it would be very difficult to prove the bias in a posttrial hearing. *Id.* at 230, 102 S. Ct. at 953. Justice Marshall cited precedent for the proposition that "[b]ias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence." *Id.* at 231, 102 S. Ct. at 953 (quoting *Crawford v. United States*, 212 U.S. 183, 196, 29 S. Ct. 260, 265 (1909)). Justice Marshall asserted that when the probability of bias is very high, a juror should be "automatically disqualified, despite the absence of proof of actual bias." *Id.*

The last United States Supreme Court case is *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770 (1993). In this case, the defendants were convicted of crimes related to a loan kickback scheme. *Id.* at 727–29, 113 S. Ct. at 1774–75. In *Olano*, alternates were permitted to sit in the jury room during deliberations but were instructed not to participate. *Id.* The question in *Olano* was whether the presence of the alternates during jury deliberations was "plain error" subject to correction under Federal Rule of Criminal Procedure 52(b). *Id.* at 727, 113 S. Ct. at 1774.

In an opinion by Justice O'Connor, the *Olano* Court concluded that plain error under rule 52(b) was not present. *Id.* at 737, 113 S. Ct. at 1779. The majority emphasized that in order to qualify under the rule, the error must be of a kind that "affects substantial rights" of the party. *Id.* In order to so qualify, the *Olano* Court declared that the error must

"seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732, 113 S. Ct. at 1776, (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S. Ct. 1038, 1046 (1985)).

The *Olano* Court concluded that no such violation of the defendant's rights occurred by the mere presence of alternate jurors in the jury room. *Id.* at 737, 113 S. Ct. at 1779. The *Olano* Court recognized there might be situations in which an intrusion into the jury room could be presumed prejudicial, but even in these cases, the ultimate inquiry continues to be whether the intrusion affected the jury's deliberation and thereby its verdict. *Id.* at 739, 113 S. Ct. at 1780. Under the posture of the case, the *Olano* Court declined to find the mere presence of alternate jurors prejudicial. *Id.* at 740–41, 113 S. Ct. at 1781.

Justice Stevens, joined by Justices White and Blackmun, dissented. *Id.* at 743, 113 S. Ct. at 1782 (Stevens, J., dissenting). Justice Stevens argued,

> [S]ome defects bearing on the jury's deliberative function are subject to reversal regardless of whether prejudice can be shown, not only because it is so difficult to measure their effects on a jury's decision, but also because such defects "undermin[e] the structural integrity of the criminal tribunal itself."

*Id.* at 743, 113 S. Ct. at 1782–83 (alteration in original) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S. Ct. 617, 623 (1986)). Justice Stevens declared that if a proper objection had been made, reversal would have been required. *Id.* at 744, 113 S. Ct. at 1783. Because no objection was made in the case, however, Justice Stevens framed the issue as whether the court of appeals' reversal of Olano's conviction was an abuse of discretion. *Id.* at 745, 113 S. Ct. at 1783. Justice Stevens concluded that it was not. *Id.* at 745, 113 S. Ct. at 1784.

3. *Caselaw in lower federal courts.* In light of the different approaches in the United States Supreme Court cases, it is not surprising that the lower federal courts have adopted different approaches to juror misconduct and bias and, in particular, the continued viability of the *Remmer* principles. Below we review how the federal courts have dealt with aspects of *Remmer*. First, we consider whether a presumption of prejudice occurs in cases involving extraneous influences on jurors. Second, we review how the federal courts handle the prejudice issue.

The caselaw on the question of whether to apply a *Remmer*-type presumption of prejudice in this field is nuanced and often fact-specific. Generally, however, as noted in *United States v. Lawson,* 677 F.3d 629, 643 (4th Cir. 2012), it appears that the Second, Fourth, Seventh, Ninth, Tenth, and Eleventh Circuits continue to apply the *Remmer* presumption of prejudice in at least some cases involving external influences on jurors. *See Godoy,* 861 F.3d at 964 n.3; *United States v. Moore,* 641 F.3d 812, 828 (7th Cir. 2011); *United States v. Ronda,* 455 F.3d 1273, 1299 (11th Cir. 2006); *United States v. Greer,* 285 F.3d 158, 173 (2d Cir. 2000); *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922–23 (10th Cir. 1992).

Several circuits apply *Remmer* in some circumstances involving external influences on jurors. For instance, in *United States v. Bradshaw,* 281 F.3d 278, 287–88 (1st Cir. 2002) (quoting *United States v. Boylan,* 898 F.2d 230, 261 (1st Cir. 1990)), the First Circuit stated that the *Remmer* presumption "is applicable only where there is an egregious tampering or third party communication which directly injects itself into the jury process." In *United States v. Lloyd,* 269 F.3d 228, 238 (3d Cir. 2001), the Third Circuit applied the *Remmer* presumption of prejudice when a jury is exposed to extraneous information "of a considerably serious nature." In another case, *Stephens v. South Atlantic Canners, Inc. (Coca Cola Co.),* 848

F.2d 484, 486 (4th Cir. 1988) (quoting *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n.9 (4th Cir. 1986)), the Fourth Circuit noted that the *Remmer* presumption was applicable for "more than innocuous interventions."

In contrast, the Fifth, Sixth, Eighth, and District of Columbia Circuits seem to follow the approaches of *Smith* and *Olano* and do not employ a presumption of prejudice. *See United States v. Sylvester*, 143 F.3d 923, 933–35 (5th Cir. 1998); *Williams-Davis*, 90 F.3d at 495–97; *United States v. Blumeyer*, 62 F.3d 1013, 1017 (8th Cir. 1995); *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984).

There is an additional question addressed in the federal cases besides the issue of whether a *Remmer* presumption is available. The federal cases also address the question of how to determine prejudice which might rebut a presumption, if one is available, or which might otherwise be part of a defendant's burden in establishing a basis for mistrial or obtaining a new trial.

In *Remmer*, the burden of proof rested with the government. There is authority suggesting that the burden of proof remains with the government in some circumstances, particularly in jurisdictions that continue to apply the *Remmer* presumption. *See Cheek*, 94 F.3d at 141 (explaining that extrajudicial comments shift burden of proof to government); *United States v. Ruggiero*, 56 F.3d 647, 652 (5th Cir. 1995) (explaining that government has the burden of showing harmlessness); *United States v. Scisum*, 32 F.3d 1479, 1484 (10th Cir. 1994) (holding that government failed to meet its heavy burden of showing harmlessness); *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984) ("Prejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the government bears the burden of demonstrating that the

consideration of the evidence was harmless."). However, in some circuits taking the view that *Remmer* was largely abandoned in *Smith* and *Olano*, the burden remains with the defendant. *See, e.g., Pennell*, 737 F.2d at 532.

Many federal courts have characterized the general question as being whether there is a "reasonable possibility" that the extrinsic material influenced the verdict. *See, e.g., Cheek*, 94 F.3d at 138; *United States v. Maree*, 934 F.2d 196, 201–02 (9th Cir. 1991), *abrogated on other grounds by United States v. Adams*, 432 F.3d 1092, 1095 (9th Cir. 2006); *United States v. Rowe*, 906 F.2d 654, 656–57 (11th Cir. 1990); *Dickson v. Sullivan*, 849 F.2d 403, 404 (9th Cir. 1988). Other federal courts have suggested that "substantial likelihood of prejudice" is the proper test. *See, e.g., Lloyd*, 269 F.3d at 243.

In any event, it is clear that "[t]here is no bright line test for determining whether a defendant has suffered prejudice from an instance of juror misconduct." *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) (quoting *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997), *overruled in part on other grounds by Payton v. Woodford*, 299 F.3d 815, 827–29 & n.11 (9th Cir. 2002)). A number of federal courts, however, have articulated a nonexclusive factor test to aid courts in determining the issue of prejudice. For example, the Ninth Circuit has suggested that factors relevant to the prejudice inquiry include

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Dickson*, 849 F.2d at 406 (quoting *Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987)). Other cases have also articulated multifactor formulations to guide courts in determining the prejudice issue. *See Lloyd*, 269 F.3d at 239–41 (identifying as factors the relationship of extraneous information to jury's findings, extent of the jury's exposure, timing of the jury's receipt of the extraneous information, length and structure of jury deliberations, and content of jury instructions).

Most lower federal courts have emphasized that the determination of prejudice is an objective inquiry. For example, in *Greer*, 285 F.3d at 173, the Second Circuit embraced *Remmer* in a case involving extra-record information. In determining whether the extra-record information was harmless, the court emphasized that the determination was an objective one based upon the probable effect on a "hypothetical average juror." *Id.* (quoting *United States v. Calbas*, 821 F.2d 887, 896 n.9 (2d Cir. 1987)). The *Greer* court emphasized that it would be improper for a district court to inquire into, or admit affidavits concerning, whether the extra-record information had an impact on a juror or the jury. *Id.*; *see also Lloyd*, 269 F.3d at 237–38 (emphasizing consideration of objective, not subjective, impact on hypothetical average juror); *Cheek*, 94 F.3d at 143 (holding the district court erred in relying on juror's mental processes when formulating findings of fact); *United States v. Howard*, 506 F.2d 865, 869 (5th Cir. 1975) (stating that on remand the district court must disregard affidavit purporting to reveal alleged influence of extrinsic matter and avoid examination concerning jurors' mental processes). *Cf. United States v. Armstrong*, 654 F.2d 1328, 1333 n.2 (9th Cir. 1981) ("Even though courts must apply an objective test in evaluating juror influence questions because jurors may not testify about their deliberations, it was proper for

the District Court to consider juror Gingras's statements in her note since they were before the court." (Citation omitted.)).

Several federal courts have considered whether the number of jurors who are aware of the external influence is material in the calculation of prejudice. In *Parker,* 385 U.S. at 365–66, 87 S. Ct. at 471, the United States Supreme Court stated that due process is violated if one juror is improperly influenced. Following the Supreme Court's lead, the federal caselaw suggests that the number of jurors who heard or were aware of the external influence does not weigh heavily in the analysis. *See, e.g., Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir. 1998) ("The bias or prejudice of even a single juror would violate Dyer's right to a fair trial."); *Lawson v. Borg,* 60 F.3d 608, 613 (9th Cir. 1995) ("The number of jurors affected by the misconduct does not weigh heavily in the prejudice calculus for even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict."); *United States v. Delaney,* 732 F.2d 639, 643 (8th Cir. 1984) ("If a single juror is improperly influenced, the verdict is as unfair as if all were." (quoting *Stone v. United States,* 113 F.2d 70, 77 (6th Cir. 1940))); *Tillman v. United States,* 406 F.2d 930, 937 (5th Cir. 1969) ("[I]f only one juror is improperly influenced, the trial is as unfair as if every juror was so influenced."), *vacated on other grounds,* 395 U.S. 830, 89 S. Ct. 2143 (1969) (per curiam). *But see Lloyd,* 269 F.3d at 240 (stating that the extent to which jury is exposed to extraneous information is a factor in determining prejudice).

4. *Caselaw in other states.* The caselaw in the states on the question of how to handle extraneous influences on juries is varied. For instance, in Georgia, a *Remmer*-type presumption applies not only to extraneous influences but to any type of irregular juror conduct. *Holcomb v. State,* 485 S.E.2d 192, 195 (Ga. 1997). The Georgia caselaw, however,

distinguishes between inconsequential and irregular conduct. *Lamons v. State*, 340 S.E.2d 183, 184 (Ga. 1986) ("[S]ome irregularities are inconsequential."). *See generally* Rachel Morelli, Comment, *The Connected Juror's Effect on the Sixth Amendment Right to an Impartial Jury and Georgia's Presumption of Prejudice*, 7 J. Marshall L.J. 527, 529 (2014) (discussing presumption of harm to defendant whenever there is irregular juror conduct). Similarly, the Connecticut Supreme Court concluded recently that the *Remmer*-type presumption remains good law in a jury tampering case. *State v. Berrios*, 129 A.3d 696, 712 (Conn. 2016).

Like the federal courts, state law cases that follow *Remmer* tend to leave the burden of proof with the state. *See, e.g., id.* at 713. In *State v. Stafford*, 678 P.2d 644, 647 (Mont. 1984), however, the Montana Supreme Court placed the burden on the defendant to show prejudice from a letter circulated to the jury urging the jury to resist court instructions. Similarly, in *Massey v. State*, 541 A.2d 1254, 1259 (Del. 1988), the Delaware Supreme Court placed the burden of showing actual prejudice on the defendant unless there are inherently prejudicial egregious circumstances.

Some state cases embrace the reasonable-possibility test. For instance, in *Wiser v. People*, 732 P.2d 1139, 1142 (Colo. 1987) (en banc), the Colorado Supreme Court stated that the test was "whether there is a 'reasonable possibility' that extraneous contact or influence affected the verdict to the detriment of the defendant." The *Wiser* court collected federal and state cases to the same effect. *Id.* Later, in *People v. Wadle*, 97 P.3d 932, 937 (Colo. 2004) (en banc), the Colorado court applied the reasonable possibility test.

In contrast, the New Mexico Supreme Court recently overhauled its approach to handling cases in which jurors receive extraneous material in

*Kilgore v. Fuji Heavy Industries Ltd.*, 240 P.3d 648, 656 (N.M. 2010). The *Kilgore* court abandoned the notion of presumption of prejudice for a new approach. *Id.* Under *Kilgore,* the proper inquiry is whether "there is a reasonable probability that the extraneous material affected the verdict or a typical juror." *Id.* The *Kilgore* court stated that whether there is a reasonable probability that the extraneous material affected the jury included consideration of five factors:

> 1. The manner in which the extraneous material was received;
>
> 2. How long the extraneous material was available to the jury;
>
> 3. Whether the jury received the extraneous material before or after the verdict;
>
> 4. If received before the verdict, at what point in the deliberations was the material received; and
>
> 5. Whether it is probable that the extraneous material affected the jury's verdict, given the overall strength of the opposing party's case.

*Id.*; *see also In re Hamilton*, 975 P.2d 600, 614 (Cal. 1999) (embracing "probability of prejudice" test); *Commonwealth v. Sneed*, 45 A.3d 1096, 1115 (Pa. 2012) (embracing "reasonable likelihood of prejudice" test (quoting *Carter ex rel. Carter v. U.S. Steel Corp.*, 604 A.2d 1010, 1016 (Pa. 1992))).

State courts have used an objective test for evaluating claims of jury misconduct. In *Wiser*, 732 P.2d at 1142, the Colorado Supreme Court employed an objective test to determine what effect misconduct would have on a typical jury. Similarly, in *Buchholz v. State*, 366 N.W.2d 834, 840 (S.D. 1985), the South Dakota Supreme Court emphasized that the inquiry must apply an objective test and focus on the effect of the extraneous information on a typical juror.

5. *Iowa caselaw.* Iowa caselaw has long been reluctant to set aside jury verdicts on grounds of jury misconduct. Our traditional cases emphasize that in order for a new trial to be granted based on jury misconduct, it must be shown that the misconduct influenced the jury in reaching its verdict. *See State v. Jackson,* 195 N.W.2d 687, 689 (Iowa 1972) (collecting cases).

A case with a somewhat unusual posture is *Carey,* 165 N.W.2d 27. In that case, the defendant was convicted of the crime of aggravated burglary. *Id.* at 28. In *Carey,* coffee was provided in the jury room with a typewritten sign indicating it was furnished by the county clerk and the county attorney. *Id.* The defendant moved for a mistrial, which the district court denied. *Id.* at 28–29. We found the practice would lessen public confidence in our judicial system and declared it "fraught with danger, one that is calculated to bring the administration of justice into disrepute, and one which all courts should zealously guard against." *Id.* at 30.

In light of other trial errors, however, we were not required to determine whether reversal would be appropriate based on the issue. *Id.* More than a decade later, however, we decided *Omaha Bank for Cooperatives v. Siouxland Cattle Cooperative,* 305 N.W.2d 458 (Iowa 1981). In this case, we reversed a civil judgment after a jury foreman spoke to defense lawyers, made an offer to buy them drinks which was accepted, and engaged in extended conversation. *Id.* at 461–62. We found in *Omaha Bank* there was not sufficient evidence to support a finding that the contact was not prejudicial to the adverse party. *Id.* at 462.

After *Carey* and *Omaha Bank,* we considered a first-degree murder case in which the defendant sought a new trial based upon jury irregularity in *Cullen,* 357 N.W.2d at 25. In this case, three jurors advised the court, in front of the other jurors, that they knew one of the rebuttal

witnesses and that "they absolutely would not have served had they known these witnesses would be called to testify." *Id.* at 26. The district court granted the mistrial, noting that juror statements made it easier for other jurors to believe the rebuttal witnesses. *Id.* at 26–27. In granting the relief, the district court relied on language in *Carey*, emphasizing that jury deliberations and pronouncements must be free "not only from all improper influences, *but from the appearance thereof.*" *See id.* at 27 (quoting *Carey*, 165 N.W.2d at 30).

The *Cullen* court reversed. In doing so, it found that our precedents established that in order to impeach a verdict, a three-pronged test must be met: (1) evidence must consist only of objective evidence, (2) the acts or statements must exceed tolerable bounds of jury deliberation, and (3) the misconduct must appear calculated to, and with reasonable probability did, influence the verdict. *Id.*

The *Cullen* court also considered the question of prejudice. The *Cullen* court rejected the district court's approach that the "possibility" jurors would be unable to give appropriate weight to the testimony of rebuttal witnesses was sufficient for reversal. *Id.* at 28. The court emphasized that there must be a reasonable probability the verdict be influenced, a test that the court declared "is not easy to satisfy." *Id.*

Importantly, the *Cullen* court noted that *Carey* was inapposite because it dealt with a distinct issue. *Id.* The *Cullen* court emphasized the distinction between manipulation of the jury by outsiders, as in *Carey*, and cases concerned only with the internal operation of the jury. *Id.* The *Cullen* court stated that in the case of manipulation of the jury by outsiders, a stricter rule is justified to keep the jury above suspicion. *Id.* The *Cullen* court did not indicate what that stricter rule might be. Still,

the plain suggestion is the three-pronged *Cullen* approach might not apply to outside efforts to manipulate the jury. *Id.*

In at least one case decided after *Cullen,* however, we rejected the notion that introduction of extraneous evidence gave rise to a presumption of prejudice. In *Doe v. Johnston,* 476 N.W.2d 28, 34 (Iowa 1991), we considered whether the circulation of a cartoon about the case in the jury room provided grounds for a new trial. The cartoon depicted a judge telling the jury, "The verdict should be guilty or not guilty. There's no provision for guiltyish." *Id.*

In *Johnston,* we first held that jurors were incompetent to testify about the impact of the cartoon on their verdict. *Id.* The *Johnston* court stated, "When there is proof that extraneous material has reached the jury room, the party seeking reversal on a misconduct claim must prove 'that the misconduct was calculated to, and with reasonable probability did, influence the verdict.'" *Id.* at 35 (quoting *Johnson,* 445 N.W.2d at 342). The *Johnston* court cited with approval a federal case emphasizing that the court's task was to determine whether extraneous information would prejudice an "objective, 'typical juror.'" *Id.* (citing *Urseth v. City of Dayton,* 680 F. Supp. 1084, 1089 (S.D. Ohio 1987)).

In *Johnston,* we rejected a claim that "prejudice is presumed to result from the introduction of extraneous information." *Id.* We noted that some leeway was required in order to prevent a relatively minor matter from disrupting what might be a lengthy, costly, and otherwise fair trial. *Id.* On the facts, we concluded that injection of a humorous cartoon would not prompt an objective juror to reverse his or her view after days of testimony and jury deliberation. *Id.* The *Johnston* discussion, however, seems to suggest that we were rejecting presumption of prejudice where the intrusion into the jury was minimal.

In the recent case of *Webster,* the defendant challenged a district court's denial of a posttrial motion for a new trial. 865 N.W.2d at 226. In *Webster*, the conduct of a juror was challenged on grounds that the juror was less than candid during voir dire about her relationship with the victim's family, engaged in a brief trial-related communication with a third party at a convenience store during the trial, impermissibly engaged in outside-the-record research on the age of one of the witnesses, and improperly clicked "like" on a Facebook comment in which the victim's stepmother stated "Give me strength." *Id.* at 234–35.

The defendant failed to preserve constitutional error in this case. *Id.* at 232. Webster asserted that review was for abuse of discretion. *Id.* at 233. In light of the advocacy, we stated that our review of jury misconduct was for abuse of discretion, but observed in a footnote that we did not address the question of whether de novo review would be appropriate if constitutional issues were involved. *Id.* at 231 & n.4. With respect to the legal standard to be applied to juror misconduct and juror bias, Webster asked us to apply the standard articulated in *Cullen*, 357 N.W.2d at 27. 865 N.W.2d at 234. We were thus not asked to consider the implications of *Remmer* and its progeny or the approach in *Carey*. We did not explore adopting these standards that no one asked us to consider.

In *Webster*, we rejected the claims of juror misconduct by conducting a factual review in which the standard of review and even the substantive legal standards were largely irrelevant. *See id.* at 235–41. We concluded the juror did not provide false testimony in voir dire about her relationship with the victim's family, the juror basically dusted off an interloper at a brief stop at a convenience store, the outside-the-record research occurred after the verdict was rendered, and the clicking of "like" on Facebook, though reflecting bad judgment, reflected empathy for the

stepmother who lost her son and did not relate to the guilt or innocence of the accused. *Id.*

In *Webster*, however, we cautioned that jurors are now part of the electronic world and that there was a risk that jurors could engage in electronic and social media activity during trial. *Id.* at 239–40. We urged district courts to give admonitions explicitly prohibiting electronic communications "early and often" in the course of a trial. *Id.* at 240–41.

**D. Application of Jury Misconduct Principles to this Case.**

1. *Proper standard for appellate review.* We first address the question of the proper standard of review in this case. The parties dispute whether the standard of review should be de novo or for abuse of discretion.

When a party seeks a mistrial under our rules designed to ensure a fair trial, but does not mention any provision of the Iowa or United States Constitution, we have not yet decided whether the proper approach is de novo review. In *Webster*, we reserved the question for another day in light of our general agreement with the fact-finding of the district court. *Id.* at 231 n.4.

We have broadly stated many times and in many contexts that when constitutional issues are involved, the standard of appellate review of fact-finding by the district court is de novo. *See, e.g., State v. Green*, 896 N.W.2d 770, 775 (Iowa 2017) (jury instruction impacting constitutional rights); *State v. Kennedy*, 846 N.W.2d 517, 520 (Iowa 2014) (Confrontation Clauses under Federal and Iowa Constitutions); *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 344 (Iowa 2013) (constitutionality of statutes or administrative rule); *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012) (state and federal equal protection in context of *Batson* challenge); *State v. Decker*, 744 N.W.2d 346, 353 (Iowa 2008) (Iowa due process and Fifth

Amendment right to counsel in custodial interrogation); *State v. Leutfaimany*, 585 N.W.2d 200, 203 (Iowa 1998) (Iowa due process and Fifth Amendment right to a fair trial); *State v. Morgan*, 559 N.W.2d 603, 606 (Iowa 1997) (uncounseled and coerced guilty plea); *State v. Dawdy*, 533 N.W.2d 551, 553 (Iowa 1995) (search and seizure); *State v. Schultzen*, 522 N.W.2d 833, 835–36 (Iowa 1994) (right to public trial). De novo review of constitutional issues is necessary because constitutional rules "acquire content only through application" and "[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles." *Ornelas v. United States*, 517 U.S. 690, 697, 116 S. Ct. 1657, 1662 (1996). Further, de novo review of constitutional issues "tends to unify precedent" and thus provides better insight into whether a particular circumstance constitutes a constitutional violation. *Id.*

The rules implicated in this case are designed to implement the constitutional demands of due process. If claims alleging violation of a constitutional right merit de novo review, the same reasons suggest de novo review may be appropriate for claims involving rules implementing constitutional rights. Mere incantation of constitutional phrases need not control our standard of review.

Still, in prior cases, we have reviewed with deference decisions on claims raised under the rules of criminal procedure. For instance, as the State points out, in *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017), "[w]e review[ed] a district court's application of the procedural rules governing speedy trial for correction of errors at law" and "[w]e review[ed] a district court's determination whether the State carried its burden to show good cause for the delay for abuse of discretion." In another case cited by the State, *State v. Clark*, 464 N.W.2d 861, 864 (Iowa 1991), we reviewed a challenge to a district court's refusal to grant separate trials

under our rules of criminal procedure and explained that "[w]e will reverse a trial court's refusal to grant a motion for separate trials only if a defendant demonstrates an abuse of discretion." Yet in neither case did the parties challenge the standard of review; in both cases the parties agreed a deferential standard of review applied. *See* Brief for Appellant at 25–26, *State v. McNeal*, 897 N.W.2d 697 (Iowa 2017) (No. 15–1606); Brief for Appellee at 14, *State v. McNeal*, 897 N.W.2d 697 (Iowa 2017) (No. 15–1606); Brief for Appellant at 13, *State v. Clark*, 464 N.W.2d 861 (Iowa 1991) (No. 89–1355); Brief for Appellee at 8, *State v. Clark*, 464 N.W.2d 861 (Iowa 1991) (No. 89–1355).

In the context of jury misconduct and jury bias, a number of courts have seen fit to review ultimate determinations with less deference than ordinarily applied in motions for new trial. For instance, Judge Posner held,

> We review the district court's findings of fact under the clearly erroneous standard. However, because the ultimate factual determination of impartiality depends on inferences of effect drawn from the subsidiary facts, we believe a more critical review of the district court's ultimate finding of fact is appropriate in this context than in other situations.

*Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984). The Fourth Circuit applies substantially the same standard:

> The final question is whether the improper contact or communication compromised the impartiality of the jury. Ordinarily, the grant of a new trial is committed to the sound discretion of the district court. However, because the ultimate factual determination regarding the impartiality of the jury necessarily depends on legal conclusions, it is reviewed in light of all the evidence under a "somewhat narrowed," modified abuse of discretion standard giving the appellate court "more latitude to review the trial court's conclusion in this context than in other situations."

*Cheek*, 94 F.3d at 140 (citation omitted) (quoting *Haley*, 802 F.2d at 1532, 1537 nn.11–12).

Other jurisdictions, however, afford more deference to a trial court's determination. In the Eighth Circuit, "[t]he district court has broad discretion in handling allegations of juror misconduct and its decision will be affirmed absent an abuse of discretion." *United States v. Williams*, 77 F.3d 1098, 1100 (8th Cir. 1996). In Connecticut, allegations of juror bias or misconduct are reviewed for an abuse of discretion because "[a]ny assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with [such] allegations . . . will necessarily be fact specific." *State v. Brown*, 901 A.2d 86, 89 (Conn. App. Ct. 2006) (quoting *State v. Sinvil*, 876 A.2d 1237, 1245 (Conn. App. Ct. 2005)).

We need not resolve this issue in this case. As in *Webster*, 865 N.W.2d at 231 n.4, we generally agree with the fact-finding of the district court. Therefore, the result in this case does not depend on the standard of review. This approach is consistent with *State v. Martin*, 877 N.W.2d 859, 865 n.4 (Iowa 2016), where we left for another day the question of whether claims under our rules designed to protect a defendant's right to a fair trial give rise to de novo review when the defendant fails to make a constitutional claim.

2. *Presumption of prejudice.* We must next determine whether there is an irrebuttable presumption of prejudice. We note Justice O'Connor's concurring opinion in *Phillips* that under the Sixth Amendment there might be occasions where the facts are sufficiently egregious to require an irrebuttable presumption. 455 U.S. at 222–24, 102 S. Ct. at 948–49 (O'Connor, J., concurring). And we do not regard our Iowa caselaw as necessarily foreclosing an irrebuttable presumption in the appropriate circumstances. But we do not find the present case involving a relatively vague and unspecific rumor of a potential riot briefly discussed by jurors

sufficient to give rise to an irrebuttable presumption of the kind suggested by Justice O'Connor.

Having concluded that there is no irrebuttable presumption of prejudice under the facts of this case, there remains the possibility of applying a rebuttable presumption as in *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451, and as still applied by a majority of the federal courts. There is caselaw suggesting that this type of *Remmer* presumption is particularly appropriate in jury tampering cases. For instance, in *Dutkel*, 192 F.3d at 894–95, 899, the Ninth Circuit suggested that in jury tampering cases, the *Remmer* presumption should apply and the state should have to meet a heavy burden to prove that the tampering was not prejudicial.

Based on our review of the trajectory of the cases of the Supreme Court and the federal circuits, we believe that *Remmer* may have some remaining vitality under the Federal Constitution as a rebuttable presumption in certain circumstances. And of course, we can apply such a presumption under article I, sections 9 and 10 of the Iowa Constitution. In this case, however, we are not dealing with direct jury tampering or bribery efforts by third parties. Instead, we are dealing with jurors who learned about a vague and generalized report on social media that some unknown persons might engage in a riot related to the trial in question. *Dutkel* does not provide much aid to Christensen on the facts of this case. We agree with the courts taking the position that the *Remmer*-type presumption is for "more than innocuous interventions." *Stephens*, 848 F.2d at 486 (quoting *Haley*, 802 F.2d at 1537 n.9); *see Lloyd*, 269 F.3d at 238; *Lamons*, 340 S.E.2d at 184. While *Remmer* may have some remaining vitality under federal and state law, we do not think it applies to the facts of this case.

We also do not find that the principles in *Carey*, 165 N.W.2d at 28–30, or *Omaha Bank*, 305 N.W.2d at 461–62, are applicable in this case. It was poor judgment for the clerk and county attorney to post its message in the jury room that the coffee was being provided by them. 165 N.W.2d at 30. Although hardly constituting a bribe of the kind that might sway juries, it did send an informal message that the county attorney and members of the jury were on the same team. *See id.* The *Carey* court clearly wanted to send a contrary message that even this small accommodation from a party to litigation had no place in our court system where the appearance of fairness is extremely important. *See id.* It is not at all clear that but for other trial errors, the *Carey* court would have reversed the conviction. *See id.*

In *Omaha Bank*, the challenged conduct involved a juror buying drinks for lawyers and having extended conversation with the lawyers in the midst of trial at a restaurant bar. 305 N.W.2d at 461. The *Omaha Bank* court condemned the lawyers for attempting to ingratiate themselves to a juror by accepting drinks and engaging in extended conversation with the juror at the bar. *Id.* at 461–63. In the case presently before us, there was no similar misconduct by a party or a party's representatives.

3. *Requirements of prejudice.* On the question of prejudice, the caselaw is generally divided regarding the standard of prejudice required in extraneous influence cases. Many federal extraneous influence cases recite a possibility-of-prejudice test, while others embrace a more demanding reasonable-probability test. In *Cullen*, a case involving the internal workings of the jury, we adopted a higher reasonable-probability test. 357 N.W.2d at 27. We have repeatedly applied the reasonable-probability test in a variety of settings. *See, e.g., State v. Atwood*, 602 N.W.2d 775, 778–80 (Iowa 1999) (holding that a judge's communication of

threat made to all participants in the case, including the jury, is subject to a reasonable likelihood or reasonable probability of prejudice test); *State v. Henning*, 545 N.W.2d 322, 324–25 (Iowa 1996) (holding that extra-record information about defendant's prior criminal offenses sufficiently prejudicial to meet reasonable-probability test). We apply the reasonable-probability test of *Cullen* today.

We also note that our prior cases adopt the view that juror statements about the impact of the improperly introduced influence are not admissible on the question of prejudice. *Johnston*, 476 N.W.2d at 34; *Carey*, 165 N.W.2d at 30. What can be considered is objective facts—who said what to whom and when and what specifically was injected into the jury discussion. But juror assessments about the impact of the improper extraneous influence are off limits. *Johnston*, 476 N.W.2d at 34; *Carey*, 165 N.W.2d at 30; *see also Greer*, 285 F.3d at 173; *Calbas*, 821 F.2d at 896 n.9; *Wiser*, 732 P.2d at 1142; *Buchholz*, 366 N.W.2d at 840.

Finally, we recognize that in determining fair trial issues, one improperly influenced juror is sufficient to require reversal. *Parker*, 385 U.S. at 365–66, 87 S. Ct. at 471; *Webster*, 865 N.W.2d at 237 n.7. We should not be distracted by a numbers game regarding how many jurors heard what and when they heard it. *See, e.g., Lawson*, 60 F.3d at 613; *Delaney*, 732 F.2d at 643; *Tillman*, 406 F.2d at 937. The issue instead should be focused on the question of whether any juror or jurors have been shown to be improperly influenced such that a conviction based on a verdict in which the juror or jurors participated simply cannot be upheld.

4. *Determination of prejudice issue.* We focus our analysis on the question of prejudice. In doing so, we agree with the approach of courts that consider multiple factors in determining the question of prejudice. *Lloyd*, 269 F.3d at 240; *Dickson*, 849 F.2d at 406; *Kilgore*, 240 P.3d at 656.

Based on our review of the record, we conclude that Christensen failed to show a reasonable probability that the verdict of the jury would have been different if the extraneous influence did not reach the jury in this case. *Cullen*, 357 N.W.2d at 27. Here, the threat of a riot reported to the juror and the jury was vague, was not directed at any juror, and was merely a hearsay statement about what purportedly appeared in social media. Every reasonable juror knows that a wide variety of vacuous claims and statements may appear on social media without the slightest veracity. In addition, there was no objective support for the threat of a riot in the record except the vague hearsay report of a Facebook comment.

There was evidence that the vague report to the jury about a Facebook posting mentioning a riot was only briefly discussed by the jury. There was no evidence of an extended discussion. *See Dickson*, 849 F.2d at 406. Further, though the discussion about a riot appears to have occurred prior to the jury actually reaching a verdict, the record suggests that the discussion likely may have occurred after the jury reached its verdict but prior to announcing it in open court. *See id.* There was certainly no persuasive specific evidence that the rumors of a potential riot were discussed at a critical stage in the jury's deliberation. *See id.* Finally, there was nothing extraordinary about the jury verdict of second-degree murder in this case, a verdict that was well within the evidence presented at trial. *See Kilgore*, 240 P.3d at 656; *United States v. Sanders*, 962 F.2d 660, 673 (7th Cir. 1992). There is no objective reason to consider the jury verdict as motivated by fear from a vague speculative hearsay report on Facebook about a possible riot.

We recognize that at least some members of the jury did express concern about safety at the courthouse and asked for a police escort to their cars. Another asked for an officer to patrol the juror's home. These

protective measures after a controversial trial show a degree of common sense but do not make a persuasive per se case that the jury's verdict was likely influenced by the vague hearsay riot rumors. *See State v. Napulou,* 936 P.2d 1297, 1304 (Haw. Ct. App. 1997).

Although each case will turn on its specific facts, the result we reach here is not inconsistent with other caselaw. For instance, in *Wallace v. United States,* 412 F.2d 1097, 1102 (D.C. Cir. 1969), jurors were interviewed in chambers after a newspaper article detailed certain death threats against the jurors. The jurors' responses convinced the district court that they could continue to serve as impartial jurors. *Id.* Similarly, in *Napulou,* the court upheld a district court determination that a new trial was not required after the jurors felt intimidated upon being followed by the defendant's family members, a setting far more troubling than that presented in this case. 936 P.2d at 1304.

Christensen cites two cases in which the potential for public violence led to a change in venue. *Powell,* 283 Cal. Rptr. at 787; *Lozano,* 584 So. 2d at 22. We find these cases inapposite. They are pretrial change of venue cases in which there had been massive publicity and substantial threats of violence had arisen from the underlying incidents. We do not find them instructive on the case at hand.

Based on the above reasoning, we conclude that Christensen has failed to meet the *Cullen* test of showing a reasonable probability that the jury would have come to a different conclusion if it had not received the vague and speculative extraneous information about a potential riot.

**E. Jury Bias.** Christensen notes in passing that the district court erred in concluding that implied bias did not warrant a new trial. Christensen supports his claim of implied bias by pointing to the testimony of a juror claiming that two jurors saw Facebook posts threatening the

jurors themselves. He also notes that the jurors were aware of the heightened community awareness surrounding the case.

In *Webster*, 865 N.W.2d at 236, we explained that juror bias may be actual or implied. "Actual juror bias occurs when the evidence shows that a juror, in fact, is unable to lay aside prejudices and judge a case fairly on the merits." *Id.* "Implied bias arises when the relationship of a prospective juror to a case is so troublesome that the law presumes a juror would not be impartial." *Id.* "Implied bias has been found to arise, for instance, when a juror is employed by a party or is closely related to a party or witness." *Id.* A jury consisting of even one biased juror is constitutionally infirm. *Id.* at 237 n.7.

We decline to find implied bias on the facts here. The ostensible threat to the jury attested by one juror is hearsay-upon-hearsay. That fact in tandem with the fact that other jurors generally testified to threats of riots rather than of violence against the jury, leads us to doubt the reliability of the attestation. *See State v. Evans*, 169 N.W.2d 200, 205 (Iowa 1969) ("Multiple hearsay is, of course, even more vulnerable to all the objections which attach to simple hearsay.").

Similarly, we do not find that the other threats of violence which reached the jury give rise to implied bias. As noted, these threats were vague, not directed at any juror, and only briefly discussed by the jurors in the jury's deliberation.

Finally on the facts here, we disagree with Christensen's contention that the heightened community awareness surrounding this case, and jurors' general knowledge thereof, gives rise to implied bias. It is certainly possible that a juror's connection to the circumstances of a case or the community response can give rise to implied bias. *See, e.g., Leonard v. United States,* 378 U.S. 544, 544–45, 84 S. Ct. 1696, 1696 (1964) (per

curiam) (finding implied bias where jurors in a second case against Leonard were selected from a group which heard a guilty verdict in the first case). But here, various members of the community were on either sides of the guilt question, and through the voir dire process, potential jurors were stricken for cause after expressing opinions both favorable and unfavorable to Christensen. Christensen points to no facts concerning any of the jurors' connection to the community response besides their membership in the community. Without an indication that a juror had such a close connection to the circumstances of the case or the community response that the juror would be unable to render a fair verdict, we cannot make a finding that any juror or the jury was tainted by implied bias. *See Webster*, 865 N.W.2d at 236. Perhaps given the verdict, Christensen regrets not having moved for a change of venue, but he cannot remedy the consequences of that choice through an attack on the jury that has been selected after a thorough pretrial voir dire process.

### V. Conclusion.

For the above reasons, the district court judgment is affirmed and the court of appeals decision is vacated.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Waterman, Mansfield, and Christensen, JJ., who concur specially, and McDonald, J., who takes no part.

**WATERMAN**, **Justice (concurring specially).**

I concur in the court's opinion except for its discussion of the standard of review for the denial of a motion for new trial based on juror bias or misconduct. I write separately to emphasize that today's decision refraining from deciding the standard of review in this appeal does not overrule our precedent or change the governing law, nor is a change warranted from our review for abuse of discretion.

Indeed, in affirming the district court's ruling that extraneous influences on the jury did not warrant a new trial, the majority applies the proper test from *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984), *abrogated on other grounds by Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). Citing *Cullen*, the majority reaches the right result, stating, "Based on our review of the record, we conclude that Christensen failed to show a reasonable probability that the verdict of the jury would have been different if the extraneous influence did not reach the jury in this case." But the majority fails to acknowledge the standard of review applied in *Cullen*, which emphasized the "[t]rial court has a broad discretion in ruling on these matters. 'We do not find an abuse of discretion . . . unless the action of the trial court is clearly unreasonable under the attendant circumstances.'" *Id.* at 27 (quoting *State v. Harrington*, 349 N.W.2d 758, 761 (Iowa 1984), abrogated on other grounds *by Ryan*, 422 N.W.2d at 495).

In *Doe v. Johnston*, we declined an invitation to change this standard and explained the reasons for our deference to the trial court when extraneous material reaches the jury. 476 N.W.2d 28, 35 (Iowa 1991).

> Plaintiffs urge us to retreat from this standard and adopt, instead, a rule whereby prejudice is presumed to result from the introduction of extraneous material. We decline the

invitation to do so. A certain amount of leeway must be built into the system so that a relatively minor incident of misconduct is not allowed to disrupt what may have been a lengthy, costly, and otherwise fair trial. We are still convinced that the trial court is in the best position to objectively assess the impact of juror misconduct.

Applying this objective standard to the present case, we find the court was well within its discretion in denying plaintiffs' motion for new trial.

*Id.* This reasoning is even more compelling today because the proliferation of social media increases the chances for juror exposure to extraneous material.

The majority fails to provide a persuasive reason to change the standard of review now. We have long held that rulings on motions for new trial or mistrial based on juror misconduct or bias are reviewed for an abuse of discretion. *See, e.g., State v. Gathercole,* 877 N.W.2d 421, 427 (Iowa 2016) ("We review the district court's refusal to grant a mistrial [for juror bias] for an abuse of discretion."); *Fry v. Blauvelt,* 818 N.W.2d 123, 128 (Iowa 2012) ("If the motion [for a new trial] is based on a discretionary ground such as misconduct it is reviewed for an abuse of discretion." (alteration in original) (quoting *Loehr v. Mettille,* 806 N.W.2d 270, 277 (Iowa 2011))); *State v. Smith,* 573 N.W.2d 14, 17 (Iowa 1997) ("We apply an abuse of discretion standard when reviewing the district court's rulings on juror misconduct claims . . . ."); *State v. Johnson,* 445 N.W.2d 337, 340–41 (Iowa 1989) (noting trial court's "broad discretion in ruling on" motions for new trial based on juror bias or misconduct), *overruled on other grounds by State v. Hill,* 878 N.W.2d 269, 275 (Iowa 2016); *State v. Hendrickson,* 444 N.W.2d 468, 472 (Iowa 1989) (holding district "court did not abuse its discretion in denying defendant's motions" challenging allegedly biased juror); *State v. Powell,* 400 N.W.2d 562, 565 (Iowa 1987) ("A trial court has broad discretion in matters involving alleged jury misconduct, and an

abuse of that discretion will not be found unless the action of the trial court is clearly unreasonable under the circumstances."); *State v. Christianson*, 337 N.W.2d 502, 504 (Iowa 1983) ("Trial courts possess 'broad discretion' in deciding whether evidence of alleged jury misconduct warrants a new trial." (quoting *State v. Cuevas*, 288 N.W.2d 525, 535 (Iowa 1980)); *Harris v. Deere & Co.*, 263 N.W.2d 727, 729 (Iowa 1978) ("Trial courts have broad discretion in ruling on motions predicated on jury misconduct."), *superseded on other grounds by rule*, Iowa R. Evid. 606(*b*), *as recognized in Ryan*, 422 N.W.2d at 495; *State v. Houston*, 209 N.W.2d 42, 44–45 (Iowa 1973) (noting the "[t]rial court has broad discretion in determining whether evidence of claimed jury misconduct justifies a new trial" and its ruling "will not be set aside on appeal except upon showing an abuse of such discretion"). This law is well settled and should stay that way.

But seeds of confusion were planted when we addressed the standard of review in *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015). Under the heading "**Standard of Review**," we accurately stated Iowa law as follows: "We review a denial of a motion for a new trial based upon juror misconduct or juror bias for an abuse of discretion." *Id.* Yet we muddied the waters in a footnote, stating,

> There is a question of the proper standard of review regarding fact-finding performed by the district court in the context of a motion for a new trial. There is authority in other jurisdictions that fact-finding made by the district court in considering a motion for a new trial is subject to review under a clearly erroneous standard.

*Id.* at 231 n.4. This footnote cited a single case for that proposition, *State v. Dellinger*, 696 S.E.2d 38, 42 (W. Va. 2010) (per curiam). The *Dellinger*

court described its standard of review as "deferential" to the trial court. *Id.* at 42.

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Id.* (quoting *State v. Vance*, 535 S.E.2d 484, 487 (W. Va. 2000)). Thus, the trial court's factual findings would be affirmed unless clearly erroneous— a far cry from appellate de novo review.

*Dellinger* thus offers no support for de novo review of fact-finding for juror bias or misconduct. The *Webster* footnote, however, went on to cite a search and seizure case for the unremarkable proposition that we apply de novo review to fact-finding on constitutional claims. 865 N.W.2d at 231 n.4. By suggesting a connection between two separate lines of authority, the footnote purported to create an issue where none existed, concluding, "In this case, we do not resolve the issue because we generally agree with the fact-finding of the district court." *Id.* What issue? We should not compare apples and oranges. De novo review of constitutional issues has long coexisted with our deferential review of judgment calls trial courts make on a wide variety of rulings. There arguably is a constitutional dimension to any ruling during a criminal trial, but that does not mean we should now start reviewing all trial rulings de novo. I would not start here.

After *Webster,* we revisited the issue of juror bias claims arising from inaccurate midtrial publicity in *Gathercole* and squarely held our review is for an abuse of discretion. 877 N.W.2d at 427. In *Gathercole,* while an attempted murder trial was ongoing, a local newspaper inaccurately

reported in an online article that the police had recovered the defendant's palm print at the crime scene. *Id.* at 425. The defendant moved for a mistrial or, alternatively, to poll the jury to determine if jurors saw the article. *Id.* The district court denied the motions, and the defendant was convicted and appealed. *Id.* at 426. We concluded the district court did not abuse its discretion in denying the motions for mistrial and jury polling. *Id.* at 432–33.

Despite our well-settled law on the standard of review, Christensen's counsel took the hint buried in the *Webster* footnote and argues for de novo review. Our court today takes the same approach as in *Webster*, stopping short of deciding "the issue" over the standard of review because of general agreement with the district court's factual findings. Yet the court adds a lengthy discussion likely to cause further confusion, unnecessary detours, and wasted court time. The bottom line is that neither *Webster* nor today's decision overrules our precedent holding abuse of discretion is the proper standard of review for juror-bias and misconduct cases.

The majority also overlooks our long-standing precedent that the district court's factual findings on juror bias or misconduct are binding on the appellate court when the findings are supported by substantial evidence. *See Hutchinson v. Fort Des Moines Cmty. Servs., Inc.*, 252 Iowa 536, 543, 107 N.W.2d 567, 571 (1961) ("Where the facts on which a claim of misconduct is based are in dispute we will not interfere with the trial court's determination of the matter if supported by substantial evidence. *Such determination has about the same force as a jury verdict.*" (quoting *Hackaday v. Brackelsburg*, 248 Iowa 1346, 1352, 85 N.W.2d 514, 517–18 (1957))); *see also* Iowa R. App. P. 6.904(3)(*a*) ("Findings of fact in a law action . . . are binding upon the appellate court if supported by substantial

evidence."); *State v. Gomez Garcia*, 904 N.W.2d 172, 177 (Iowa 2017) (" '[A]buse of discretion occurs when a district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' 'A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.' " (alteration in original) (first quoting *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016); then quoting *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000))).  No one claims the district court's factual findings in this case were not supported by substantial evidence.

Neither Christensen nor today's majority opinion cite a single case from any jurisdiction applying de novo review to fact-finding on juror bias or misconduct.  We should not create an issue when none exists.  Going forward, the standard of review for such cases should remain what it has been for generations—abuse of discretion.

We have long adhered to the abuse-of-discretion standard because of the trial judge's superior vantage point.  The trial judge presides over the trial, with a front row seat for the testimony.  *See Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 803 (Iowa 1992) ("The trial court has before it the whole scene, the action and incidents of the trial as they occur, and is in a much better position to judge whether the defendant has been prejudiced by misconduct of opposing counsel, if there is such. . . . The trial court occupies a position of vantage and is rightly given a considerable discretion in determining whether prejudice has resulted." (alteration in original) (quoting *Baysinger v. Haney*, 261 Iowa 577, 582, 155 N.W.2d 496, 499 (1968))).  When jurors are questioned, the trial judge observes their demeanor firsthand.  The trial judge is far better positioned than an appellate court reading a cold transcript to decide whether what

a juror said, did, or heard improperly influenced the verdict. The trial judge can read the room in real time.

The United States Court of Appeals for the Fourth Circuit recently reiterated the rationale for this deferential review: "As the trial judge is in the best position to make this determination [regarding juror bias], the inquiry is committed to his discretion, including ample leeway to formulate the questions to be asked." *United States v. Smith,* 919 F.3d 825, 834 (4th Cir. 2019). De novo review cedes too much control to an appellate court ill-suited to wield it. The Fourth Circuit aptly determined, "Th[e] trial judge made reasoned judgments [to detect juror bias]. And we are not here to micro-manage those considered choices." *Id.* The same is true here.

For these reasons, I am unable to join the majority's discussion of the standard of review. I otherwise concur in the opinion.

Mansfield and Christensen, JJ., join this special concurrence.